[No. B163795. Second Dist., Div. Seven. Aug. 20, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM HODGSON, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of Discussion parts I.D., II., III. and IV.

COUNSEL

Richard A. Levy, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Susan D. Martynec and Alan D. Tate, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**JOHNSON, J.**—Appellant, William Hodgson, held open the electric gate of an underground parking garage of an apartment complex to facilitate the escape of his fellow gang member who had robbed and shot to death a woman just after she opened the gate with her key card. A jury convicted him of first degree murder and first degree robbery and found true the special circumstance allegation the murder was committed during the commission of a robbery. In addition, the jury found true the allegation the crimes were committed for the benefit of a criminal street gang and found true all related gun use enhancements. He received a sentence of life without the possibility

of parole plus a consecutive determinate term of 25 years to life. He appeals, claiming the evidence was insufficient he aided and abetted the robbery murder; the special circumstance finding must be reversed due to insufficient evidence he was a "major participant" in the crimes or acted with "reckless disregard for life"; there was insufficient evidence the crimes were committed for the benefit of the gang; the court prejudicially erred in admitting evidence of a prior uncharged crime; his sentence constitutes cruel and unusual punishment; and the trial court committed sentencing error in failing to award full presentence custody credit.

We find, and the People concede, appellant is entitled to two additional days of presentence custody credit. Accordingly, we will correct the judgment to reflect appellant's actual days of custody. As corrected, we affirm.

### FACTS AND PROCEEDINGS BELOW

Harvard Street is a criminal street gang. The gang has between 15 to 20 members and began as a tagging crew. Over time, however, Harvard Street gang members began committing robberies, stealing cars, burglarizing cars, and with this case, committing murder for purposes of robbery. The Harvard Street gang claimed an area in and around Third Street and Harvard Street. Gang members usually congregated at two apartment buildings at 239 and 259 Harvard Street.

Appellant was a member of the Harvard Street gang, as was his codefendant, Victor Salazar. Appellant's moniker was "Willis" and codefendant Salazar was known as "Acer." Some of the graffiti in the area showed their monikers together.

Appellant turned 16 years old two and a half months before the crimes in this case. Eleven months earlier appellant had been involved in another robbery with fellow Harvard Street gang member Michael Bellows. As Carlos Tejax exited a video store Bellows approached and asked him for a dollar. In the meantime, appellant had crossed the street when the light turned green. When he noticed Bellows had stopped Tejax he returned to Bellows's side. Tejax took out his wallet intending to give Bellows a dollar. Bellows then stuck a screwdriver in Tejax's side and grabbed Tejax's wallet. Bellows removed $150, or all of Tejax's money, and handed back his wallet. Appellant in the meantime stood nearby looking up and down the street acting as a "lookout" during the robbery. Bellows and appellant walked off together laughing.

Tejax immediately called police. Suspecting Harvard Street gang members were involved officers detained appellant and Bellows when officers found them in their gang meeting place in the laundry room of the apartment complex at 259 Harvard Street. Tejax arrived for a field showup. He identified Bellows as the man with the screwdriver and appellant as his accomplice.

Shortly after 11:00 p.m. on December 12, 2000, Ms. Jee Nam returned home and drove her car up to the remote-controlled entry gate to the underground parking garage of her apartment building. This apartment complex is located a few blocks away from Third and Harvard Streets. Ms. Nam pulled her car onto the driveway apron as the electric gate opened. Just then, Salazar approached and fired his .380 caliber semiautomatic handgun through the closed driver's side window. He fired from no more than 18 inches away. The window glass shattered and fell onto the driveway. The bullet struck Ms. Nam in the neck.

Ms. Nam's car rolled into the garage and struck a pillar and a parked car. Salazar ran to the car and fired another bullet through the driver's side window into Ms. Nam's head. She died nearly instantly from the two gunshot wounds.

Meanwhile, appellant was straddling the electric gate and holding it with both hands trying to keep it from closing. Salazar grabbed Ms. Nam's purse and wallet. As the gate continued to close appellant yelled something to Salazar in the garage. Appellant released the gate and started walking away. Just then, Salazar emerged from the garage and squeezed his body through as the gate began to close. With this move Salazar somehow knocked the gate off track. He caught up with appellant who was 10 to 15 feet away. The two men walked away at a normal gait.

Jesse Wallis lived across the street on the second floor of an apartment complex. He had just returned home around 11:00 p.m. A few minutes later he heard a noise and went to his window overlooking Oxford Street. As he pulled back the curtain he heard another noise. He looked out the window and noticed a man holding open the electric gate to the parking garage of the apartment complex across the street. He heard the man holding the gate yell something. Seconds later the man holding the gate started walking away and he was immediately followed by a man who emerged from the parking garage holding a bag resembling a department store shopping bag. Mr. Wallis watched the man squeeze through the closing gate and continued to watch as the two men walked casually away.

Mr. Wallis ran out of his apartment and went into the garage. He walked though broken glass on the driveway as he entered the garage. Inside the garage he saw a woman slumped over and falling out of the driver's side door of a car. The car had run into a pillar and another car. The car's engine was still running and the car's radio was still on. Mr. Wallis checked her pulse and could find none. He ran back outside and yelled up to his girlfriend to call "911."

Police arrived within minutes. Mr. Wallis told the officers he did not get a close look at either man's face because from his angle he saw them either in profile or from the back. He described the two perpetrators as young Hispanic males, between the ages of 17 to 22, between five feet seven inches to five feet eleven inches tall, both wearing all black clothing. The man who had been inside the garage wore a black "beanie" on his head.

A few minutes later police officers detained two Hispanic males a few blocks away from the crime scene. At a field showup Mr. Wallis quickly eliminated the two men as the probable perpetrators. They were older than the two men he saw. Moreover, their height, weight and other physical characteristics did not match his image of the two men he had seen. However, the two detained men told police two other young Hispanic males had run past them just 10 minutes earlier at the intersection of Second and Harvard Streets. The taller of the two men was concealing something under his jacket.

Meanwhile another police officer a few blocks away was patrolling near Third and Harvard Streets. He saw two young Hispanic males running down the street. The two men were appellant and codefendant Salazar. Salazar's tennis shoes were splattered with blood. The officer detained them at 11:37 p.m., or within 30 to 40 minutes of the shooting.

At a field showup the two Hispanic men whom police had initially detained identified appellant and Salazar as the two young Hispanic males they had seen run past them several minutes earlier two blocks from the crime scene.

Police officers also brought Mr. Wallis to the field showup. Mr. Wallis told the police these two men fit the description of the two men he saw based on their clothing, their build, their age, and their height and weight differences. However, Mr. Wallis told police he could not be 100 percent certain of his identification because he did not get a good look at their faces. He only saw the men's side profiles or the backs of their heads from his perspective.

The next morning an officer familiar with the Harvard Street gang visited one of the members' regular haunts, the apartment building at 239 Harvard Street. Gang members often used the laundry room to hang out or smoke marijuana. Inside the laundry room the officer found Ms. Nam's purse on a windowsill. The purse had blood splatters on it. In a nearby Dumpster the officer found a trash bag filled with discarded laundry supplies, such as empty detergent boxes and the like. Inside the trash bag the officer discovered Ms. Nam's bloody wallet which still contained Ms. Nam's identification. There was neither cash nor credit cards in either Ms. Nam's purse or wallet.

DNA analysis of the blood splatters on Salazar's shoes and Ms. Nam's wallet and purse confirmed the blood was Ms. Nam's. Ballistics analysis of

the bullet casings found at the scene and the bullets recovered from Ms. Nam's body showed a single gun fired both shots. The gun was never recovered.

The coroner opined the first shot hit Ms. Nam's neck based on the glass in her neck and the fact the bullet was somewhat blunted by first having to penetrate the car's window. By contrast, the second shot to the back of her head entered cleanly. The coroner opined either shot would have been fatal and would have caused death within seconds.

To preclude further evidence at trial of predicate acts to prove the criminal street gang enhancement, appellant stipulated the Harvard Street gang was a criminal street gang within the meaning of Penal Code section 186.22.

A police gang expert testified appellant and Salazar were admitted members of the Harvard Street gang. He saw them together nearly every day at their usual gang meeting places at the apartment complexes at 259 and 239 Harvard Street. In the expert's opinion, the present crimes were committed for the benefit of the Harvard Street gang. He explained the benefits to the gang from committing this robbery and murder included (1) cash to enable the gang to buy additional firearms; (2) instilling fear in the community so gang members could commit additional crimes with impunity knowing citizens will be too afraid to report the gang's activities to the authorities; and (3) greater respect from rival gangs when they learned Harvard Street gang members were capable of killing their robbery victims "without hesitating." The gang expert opined gang members also derive a personal benefit from committing such crimes. "Putting in" this type of "work" garners respect from other gang members. It helps prove their loyalty to and unity with the gang.

Appellant did not present an affirmative defense. His theory of defense was mistaken identity. He pointed out Mr. Wallis could not positively identify him as the person holding open the garage gate for Salazar. He noted no two witnesses could agree whether he was taller or shorter than Salazar, or explain why he was wearing a beanie when detained whereas Mr. Wallis testified Salazar wore a beanie when he emerged from the garage. Appellant argued it was reasonable to infer from the evidence he had simply been loitering at the gang hangout when Salazar arrived with the loot. He noted it only took 15 minutes to walk the distance between the crime scene and the gang hangout. Finally, appellant pointed out he lived near the area where police detained him and thus had an innocent explanation for his presence on Harvard Street.

An information charged appellant and codefendant Salazar in count one with murder[1] with the special circumstance allegation of murder in the commission of a robbery.[2] Count two charged appellant and codefendant Salazar with robbery.[3] As to each count, the information alleged the crimes were committed for the benefit of a criminal street gang[4] and also alleged related gun use enhancements.[5] Ultimately, Salazar was tried separately and he is not a party to this appeal. Appellant's jury found him guilty as charged and found true all the allegations. The court sentenced appellant to the term prescribed by law of life without the possibility of parole plus a determinate term of 25 years to life on the gun use enhancement allegation.[6] The court imposed and stayed punishment for the robbery conviction and did not impose sentence on the remaining enhancement allegations. The court imposed a $10,000 restitution fine, a $1,279.57 victim restitution fine, and awarded appellant 721 days of presentence credit.

Appellant appeals from the judgment of conviction.

DISCUSSION

I. *Substantial Evidence Supports the Convictions, Special Circumstance Finding and Gang Allegation.*

    A: *Standard of Review of a Challenge to the Sufficiency of the Evidence.*

" 'To determine [the validity of a claim of insufficient] evidence, we must inquire whether a rational trier of fact could find defendant guilty beyond a reasonable doubt. In this process we must view the evidence in the light most favorable to the judgment and presume in favor of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. To be sufficient, evidence of each of the essential elements of the crime must be substantial and we must resolve the question of sufficiency in light of the record as a whole. [Citations.]' (*People v. Johnson* (1993) 6 Cal.4th 1, 38 [23 Cal.Rptr.2d 593, 859 P.2d 673].) If we determine that a rational trier of fact could find the essential elements of the crime proven beyond a reasonable doubt, the due process clause of the United States Constitution is satisfied (*Jackson v. Virginia* (1979) 443 U.S. 307, 318–319 [61 L.Ed.2d 560,

---

[1] Penal Code section 187, subdivision (a). All further statutory references are to the Penal Code unless otherwise noted.

[2] Section 190.2, subdivision (a)(17)(A).

[3] Section 211.

[4] Section 186.22, subdivision (b)(1).

[5] Sections 12022.5, subdivision (a)(1), 12022.53, subdivisions (b), (c) and (d).

[6] Section 12022.53, subdivisions (d) and (e)(1).

572–574, 99 S.Ct. 2781]), as is the due process clause of article I, section 15 of the California Constitution (*People v. Berryman* (1993) 6 Cal.4th 1048 at p. 1084 [25 Cal.Rptr.2d 867, 864 P.2d 40].)"[7]

"The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. (*People v. Bean* (1988) 46 Cal.3d 919, 932 [251 Cal.Rptr. 467, 760 P.2d 996].) 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " [Citations.]' (*Id.* at pp. 932–933.) ' "Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt." ' (*Id.* at p. 933, quoting *People v. Pierce* (1979) 24 Cal.3d 199, 210 [155 Cal.Rptr. 657, 595 P.2d 91].)"[8]

We review appellant's challenges to the evidence with these standards in mind.

### B. *Substantial Evidence Supports the Jury's Finding Appellant Was an Aider and Abettor to Sustain the Conviction of Robbery and Conviction of Murder Based on a Felony Murder Theory.*

Appellant claims the evidence he held open the garage gate to facilitate Salazar's escape with the loot is insufficient to establish he aided and abetted the robbery. He asserts by the time the sole eyewitness saw him acting in conjunction with Salazar, Salazar had already fired the second shot. Thus, he argues, no evidence established he was anything other than a mere bystander or did anything but stand by passively until both the murder and robbery had already been accomplished. He claims it is sheer speculation whether he formed an intent to aid Salazar in the crimes or only formed an intent to assist Salazar in his escape, in which case, he claims, he would only be guilty as an accessory after the fact and therefore not liable for either robbery or murder.

In support of his argument appellant relies on the decision in *People v. Pulido.*[9] *People v. Pulido*[10] involved the robbery and murder of a gas station

---

[7] *People v. Memro* (1995) 11 Cal.4th 786, 861 [47 Cal.Rptr.2d 219, 905 P.2d 1305].

[8] *People v. Stanley* (1995) 10 Cal.4th 764, 792–793 [42 Cal.Rptr.2d 543, 897 P.2d 481].

[9] *People v. Pulido* (1997) 15 Cal.4th 713 [63 Cal.Rptr.2d 625, 936 P.2d 1235].

attendant. At trial, the defendant testified he and his uncle spent the evening driving around so his uncle could purchase and smoke cocaine. At some point they drove into a gas station. The defendant thought his uncle went inside the station to get some matches. He waited outside. The defendant heard a gunshot and ran into the store. His uncle was holding a gun. The gas station attendant was bleeding from a large bullet wound in his face. The defendant yelled at his uncle, ran out of the store and got into the passenger seat of the car. A few seconds later his uncle emerged from the store holding the gun in one hand and a cash register in the other. The uncle threw the cash register onto the defendant's lap and drove away. While driving away the uncle ordered the defendant to open the register. When his uncle pointed the gun at him and insisted he open the register, the defendant retrieved a screwdriver from the back of the car and pried open the cash register. Thereafter he did as his uncle ordered and handed over the cash and disposed of the register in some bushes by the side of the road.[11]

The defendant argued the trial court should have instructed sua sponte he was not liable for the murder if he formed the intent to aid and abet the robbery only after the fatal shot.[12]

The *Pulido* court reviewed the various articulations of the complicity required for a nonkiller to be liable for murder under the felony-murder rule. The court held the felony-murder rule does not extend to killings committed before the accomplice joins the criminal enterprise. "Under *neither* of the approaches described above, however, does complicity in a felony murder extend to one who joins the felonious enterprise after the killing has been completed. An accomplice's liability for any homicide committed in further-ance of a 'common purpose' [citation] or 'common design' [citation] of robbery patently does not include a killing that preceded any agreement or intent to participate in the robbery, because the killer was not then acting in pursuit of any such common design or purpose. Even under the arguably broader complicity rule represented by [various decisions], liability does not extend to a homicide completed before the accomplice's participation in the robbery began, because the killer and accomplice were not 'jointly engaged at the time of such killing' [citation] in robbery, attempted robbery or escape from a robbery. [Citation.] Our cases establishing the complicity of a nonkiller in a felony murder have thus uniformly required, at a minimum, that the accomplice have been, at the time of the killing, a conspirator or aider and abettor in the felony."[13]

[10] *People v. Pulido, supra,* 15 Cal.4th 713.
[11] *People v. Pulido, supra,* 15 Cal.4th 713, 718.
[12] *People v. Pulido, supra,* 15 Cal.4th 713, 719.
[13] *People v. Pulido, supra,* 15 Cal.4th 713, 722–723.

The *Pulido* court did not reach the question whether a trial court has a sua sponte duty to instruct "on the nonliability of late joiners."[14] Nor did the court decide the issue whether instructional error occurred.[15] Instead, the court found the defendant could not demonstrate prejudice from the alleged instructional error because the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other properly given instructions. The special circumstance instruction directed the jury to determine whether " 'the murder was committed *while the defendant was engaged or was an accomplice in*' " a robbery, attempted robbery or the immediate flight from a robbery.[16] With the jury's true finding, the court concluded "the jury thus found—explicitly, unanimously and necessarily—that defendant's involvement in the robbery, whether as direct perpetrator or as aider and abettor, commenced before or during the killing ...."[17]

The *Pulido* court suggested special or modified instructions in cases in which substantial evidence would support a finding the defendant was a late joiner to the criminal enterprise and thus was not an aider and abettor or conspirator at the time of the killing.[18]

The direct evidence of the defendant's nonparticipation until after the killing in *Pulido* distinguishes that case factually from the present case. In this case, by contrast, there is no evidence to even suggest Hodgson was a late joiner—as distinguished from a *lack* of *direct* evidence to conclusively prove his active involvement in the robbery prior to the first shot. He was present when Salazar fired the first shot at close range through the driver's side window and into Ms. Nam's neck. He had to have heard the gunshot. He also likely heard the glass shatter and fall onto the driveway. Appellant also had to know Ms. Nam was severely injured by, and likely lost consciousness after, the first shot. Her car rolled into the garage and struck a pillar and a parked car.

 ■  Then knowing Salazar had a gun and that he had used it to incapacitate their victim, appellant assisted Salazar in the robbery/murder by holding the garage gate open so Salazar could escape from the garage with the loot. After the first shot, Salazar ran after the car into the garage and fired a second shot into Ms. Nam's head. He then took her wallet and purse. The evidence established it was at the very moment of the second shot when Mr. Wallis looked out his window and saw appellant already straddling and holding the gate open with both hands. His observations support an inference appellant

---

[14] *People v. Pulido, supra,* 15 Cal.4th 713, 726.

[15] *People v. Pulido, supra,* 15 Cal.4th 713, 730.

[16] *People v. Pulido, supra,* 15 Cal.4th 713, 727, italics in original.

[17] *People v. Pulido, supra,* 15 Cal.4th 713, 727.

[18] *People v. Pulido, supra,* 15 Cal.4th 713, 728–730.

was already at this position at or before the second shot and had consciously rendered such aid knowing Salazar's purpose and intent to commit the robbery and murder. In addition to assisting in the crimes by holding the gate open appellant also assisted in the crimes by yelling out to Salazar at the point the gate was about to close. Salazar heeded appellant's warning and barely managed to squeeze out of the closing gate with the shopping bag. Whether or not the shopping bag actually contained Ms. Nam's property is immaterial. The fact her purse and wallet were later found at the Harvard Street hangout confirmed Salazar left with loot.

From these facts, a rational juror could find appellant had actively aided and abetted Salazar in the robbery prior to the killing.[19] We thus disagree the jury's finding he acted as an aider and abettor was based on nothing more than speculation.[20]

In any event, the decision in *Pulido* does not assist appellant's position. As in *Pulido*, the jury found true the felony-murder special-circumstance allegation. Also, as in *Pulido*, CALJIC No. 8.80.1 required the jury to find "The murder was committed *during* the commission of robbery ...." Similarly, CALJIC No. 8.81.17 told the jury in order to find the special circumstance true they had to find "The murder was committed *while* the defendant was *engaged in or was an accomplice in* the commission of a robbery ...." As in *Pulido*, by their verdict the jury "explicitly, unanimously and necessarily" found appellant's decision to act as an aider and abettor in the robbery "commenced before or during the killing."[21]

---

[19] " 'A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime.' (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164 [282 Cal.Rptr. 450, 811 P.2d 742] ...; see *People v. Beeman* (1984) 35 Cal.3d 547, 561 [199 Cal.Rptr. 60, 674 P.2d 1318].)" (*People v. Hill* (1998) 17 Cal.4th 800, 851 [72 Cal.Rptr.2d 656, 952 P.2d 673].) Moreover, "[f]or purposes of determining liability as an aider and abettor [for robbery], the commission of robbery continues so long as the loot is being carried away to a place of temporary safety." (*People v. Cooper, supra*, 53 Cal.3d 1158, 1169–1170.) Thus, in this case the robbery continued until appellant and Salazar reached a place of temporary safety with the loot—the gang hangout on Harvard Street where a police officer discovered Ms. Nam's discarded purse and wallet the next day.

[20] Compare *People v. Morris* (1988) 46 Cal.3d 1, 20–21 [249 Cal.Rptr. 119, 756 P.2d 843] (fact defendant subsequently used the murder victim's credit card was insufficient to establish he had taken the card by force prior to the victim's death to support a robbery conviction, or instead had taken the credit card after the victim's death and was instead guilty of theft); *People v. Marshall* (1997) 15 Cal.4th 1, 34–35 [61 Cal.Rptr.2d 84, 931 P.2d 262] (fact defendant had the murder victim's letter in his possession did not establish he had taken it by force or fear prior to her death and finding to the contrary was purely speculative).

[21] Because we find appellant's acts of holding open the gate to facilitate Salazar's escape and yelling a warning to Salazar as the gate began to close constitute substantial evidence from which a rational juror could find appellant liable as an aider and abettor of the robbery and

C. *The Evidence Was Sufficient to Establish Appellant Was a Major Participant and Acted with Reckless Indifference to Human Life in the Crimes to Support the Jury's True Finding on the Special Circumstance Allegation.*

The prosecution's theory was Salazar was the actual killer and appellant aided and abetted the crimes. Appellant claims there was no evidence he acted with intent to kill and thus the special circumstance allegation could not apply to him unless he was not only an aider and abettor, but also acted as a "major participant" in the robbery, and in addition, acted with the requisite "reckless indifference to human life." He claims the evidence was insufficient to establish either of these elements to support the special circumstance finding the murder was committed in furtherance of the robbery.

"In order to support a finding of special circumstances murder, based on murder committed in the course of robbery, against an aider and abettor who is not the actual killer, the prosecution must show that the aider and abettor had intent to kill or acted with reckless indifference to human life while acting as a major participant in the underlying felony. (§ 190.2, subds. (c), (d).)"[22]

In this context, a "major participant" in the underlying crime includes persons "'notable or conspicuous in effect or scope' and 'one of the larger or more important members or units of a kind or group.'"[23]

It is true the evidence of appellant's involvement in the underlying crimes is not as extensive as in other cases upholding robbery-murder special-circumstance findings. For example, in *People v. Proby* the evidence established the defendant supplied the murder weapon to the actual killer; he was

---

murder, we need not address the alternative theory he was liable as an aider and abettor by acting as a lookout during the robbery murder.

[22] *People v. Proby* (1998) 60 Cal.App.4th 922, 927 [70 Cal.Rptr.2d 706], footnote omitted.

Section 190.2 provides in part: "(c) Every person, not the actual killer, who, with the intent to kill, aids, abets, counsels, commands, induces, solicits, requests, or assists any actor in the commission of murder in the first degree shall be punished by death or imprisonment in the state prison for life without the possibility of parole if one or more of the special circumstances enumerated in subdivision (a) [including murder during the commission of robbery] has been found to be true under Section 190.4. [¶] "(d) Notwithstanding subdivision (c), every person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony [including robbery] which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole if a special circumstance enumerated in paragraph (17) of subdivision (a) has been found to be true under Section 190.4."

[23] *People v. Proby, supra*, 60 Cal.App.4th 922, 933–934, quoting Webster's New International Dictionary (3d ed. 1971) page 1363.

armed with a semiautomatic handgun; he saw "pus" ooze out of the victim's head but did nothing to assist the victim; and helped his cohort take money and gift certificates out of the restaurant safe.[24]

Similarly, in *People v. Bustos*[25] the defendant helped plan the robbery of a particular victim because they wanted to steal her car. He carried out his role in the plan by physically subduing the victim after she entered the public bathroom and by grabbing her purse. After his cohort fatally stabbed the victim twice, he fled with his accomplices and the robbery loot and left the victim to die.[26]

Also in *People v. Mora*,[27] the evidence was sufficient to sustain the special circumstance finding. The defendant helped plan the robbery; was instrumental in arranging for his accomplice to enter the victim's home with a rifle; when his cohort shot the victim he carried through with the plan to steal; carried the loot away; and left the victim to die.[28]

In *Tison v. Arizona*[29] the United States Supreme Court held the Eighth Amendment did not prohibit a death sentence for a major participant in a felony which results in murder and whose mental state is one of reckless indifference to human life.[30] In *Tison*, the defendants with the help of others planned and carried out the escape of their father from prison where he was serving a life sentence for having killed a guard during a previous escape. The defendants entered the prison with an ice chest full of guns, armed their father and another convicted murderer, later helped to abduct, detain and rob a family of four, and then stood by and watched their father and the other convict murder the family members. The defendants made no attempt to help the victims, but drove away in the victims' car with the others.[31]

The present case does not present evidence appellant supplied the gun, or was armed, or personally took the loot, or the like. Nevertheless, his role in the robbery murder satisfies the requirement his assistance be "notable or conspicuous in effect or scope."[32]

To begin with, this is not a crime committed by a large gang or a group of several accomplices. Instead only two individuals were involved. Thus,

---

[24] *People v. Proby, supra*, 60 Cal.App.4th 922, 926, 929.
[25] *People v. Bustos* (1994) 23 Cal.App.4th 1747 [29 Cal.Rptr.2d 112].
[26] *People v. Bustos, supra*, 23 Cal.App.4th 1747, 1754.
[27] *People v. Mora* (1995) 39 Cal.App.4th 607 [46 Cal.Rptr.2d 99].
[28] *People v. Mora, supra*, 39 Cal.App.4th 607, 617.
[29] *Tison v. Arizona* (1987) 481 U.S. 137 [95 L.Ed.2d 127, 107 S.Ct. 1676].
[30] *Tison v. Arizona, supra*, 481 U.S. 137, 158 [95 L.Ed.2d 127, 145].
[31] *Tison v. Arizona, supra*, 481 U.S. 137, 139–141 [95 L.Ed.2d 127, 133–134].
[32] *People v. Proby, supra*, 60 Cal.App.4th 922, 933–934.

appellant's role was more "notable and conspicuous"—and also more essential—than if the shooter had been assisted by a coterie of confederates. By slowing down the closing automatic electric garage gate appellant was instrumental in assisting Salazar effect his escape with the loot. From their actions it appears appellant and Salazar believed the garage gate was the only access route for their escape. The evidence showed appellant used the full force of his body to try to keep the gate from closing until Salazar had accomplished the robbery and secured the loot. When the gate became dangerously close to closing appellant yelled a warning to Salazar and got out of his way to permit Salazar to exit. Appellant's actions suggest he believed Salazar would have been trapped inside the garage with his victim unless he acted to prevent the gate from closing. The fact police later discovered a low wall over which someone could have climbed to reach the street does not alter the men's own perception of the roles each had to play. Because appellant was the only person assisting Salazar in the robbery murder his actions were both important as well as conspicuous in scope and effect.

■ A rational juror could also have found the evidence established appellant acted with "reckless indifference to human life." This phrase "is commonly understood to mean that the defendant was subjectively aware that his or her participation in the felony involved a grave risk of death."[33] Even after the first shot it must have been apparent to appellant Ms. Nam had been severely injured and was likely unconscious. Her car rolled into the garage and collided with a pillar and another car. Appellant had to be aware use of a gun to effect the robbery presented a grave risk of death. However, instead of coming to the victim's aid after the first shot, he instead chose to assist Salazar in accomplishing the robbery by assuming his position at the garage gate and trying to keep it from closing until Salazar could escape from the garage with the loot.[34]

In sum, the evidence was sufficient for a rational juror to find the felony-murder special-circumstance allegation true.

D. *Substantial Evidence Supports the Jury's Finding the Crimes Were Committed for the Benefit of a Criminal Street Gang.*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[33] *People v. Estrada* (1995) 11 Cal.4th 568, 577 [46 Cal.Rptr.2d 586, 904 P.2d 1197].

[34] See *Tison v. Arizona, supra,* 481 U.S. 137, 151 [95 L.Ed.2d 127, 140] ("He stood by and watched the killing, making no effort to assist the victims before, during, or after the shooting. Instead, he chose to assist the killers in their continuing criminal endeavors, ending in a gun battle with the police in the final showdown").

[*]See footnote, *ante,* page 566.

## II.–IV.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The abstract of judgment is ordered corrected to reflect 723, rather than 721, actual days of presentence custody credit. The clerk of the superior court is directed to prepare a corrected abstract of judgment and to forward it to the Department of Corrections. The judgment is affirmed in all other respects.

Perluss, P. J., and Munoz (Aurelio), J.,† concurred.

Appellant's petition for review by the Supreme Court was denied November 12, 2003.

---

*See footnote, *ante*, page 566.

†Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.