Filed 4/4/14  P. v. Hunter CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>GRANT MACGREGOR HUNTER,<br><br>    Defendant and Appellant. | D064063<br><br><br>(Super. Ct. No. SCN290070-2) |

APPEAL from a judgment of the Superior Court of San Diego County, Robert J. Kearney, Judge.  Affirmed.

Siri Shetty, under appointment by the Court of Appeal, for the Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillett, Julie L. Garland, Assistant Attorneys General, William M. Wood, Scott C. Taylor, Deputy Attorneys General for the Plaintiff and Respondent.

A jury convicted Grant MacGregor Hunter of the first degree murder of Michael Sahagun (Pen. Code,[1] § 187, subd. (a); count 1), attempted robbery (§§ 211, 664; count 2), and burglary (§ 459; count 3). It found true allegations that Hunter was a principal in the commission of the offenses and vicariously liable within the meaning of section 12022, subdivision (a)(1), as well as special-circumstance allegations that the murder was committed during the commission of a burglary and attempted robbery. (§ 190.2, subd. (a)(17).) After Hunter waived a jury trial, the trial court found true that Hunter had suffered a serious felony prior conviction and a strike prior conviction. (§§ 667, subd. (a)(1), 668, 1192.7, subd. (c), 667, subds. (b)-(i), 1170.12.) On count 1, it sentenced Hunter to life without the possibility of parole, plus one year on the firearm use allegation and a consecutive five-year enhancement for the serious felony. The court stayed the remaining prison terms and enhancements under section 654.

Hunter contends (1) there is insufficient evidence to support the jury's felony-murder special-circumstance findings; (2) the trial court abused its discretion by admitting evidence elicited in violation of his Fifth Amendment rights against compelled self-incrimination under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*); and (3) the court abused its discretion by refusing to dismiss his prior residential burglary conviction. We affirm.

---

[1]    Statutory references are to the Penal Code unless otherwise specified.

FACTUAL AND PROCEDURAL BACKGROUND

In March 2011, Sean Meadows was working as a confidential informant for the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). He had known Hunter since about 2006. In late March 2011, Meadows received a telephone call from Hunter in which Hunter told him he and Mercedes Yorba were going to rob Yorba's drug dealer, a man named Mike in Carlsbad. Hunter told Meadows it was Yorba's "deal"; she was going to call Mike and place an order, then they would go into Mike's garage and take an ounce of heroin, an ounce of "speed" and $2,000 in cash. Hunter asked Meadows if he could be a driver and also if Meadows knew anything about Mike. Meadows did not tell Hunter he would drive; he told Hunter it was not worth it. Meadows immediately communicated the information to his ATF handler, and later tried to get additional information from Hunter to try to stop the plan. On April 1, 2011, Meadows received another call from Hunter, who told him "he had screwed up and it's in the paper." Hunter asked Meadows for money to pay for a motel room. Meadows reported the conversation to his ATF handler.

Meadows was fitted with a recording device and went to the motel room where Hunter, Yorba and another man, Gary Gomez, were staying. Meadows asked Hunter what had happened, and Hunter said the man "was supposed to be a punk and jumped up and put his hand behind his back." During their conversation, Hunter told Meadows that the man took a 12-gauge shotgun shot to the stomach and "a knife to the heart." Hunter said, "This was . . . dude then he jumped up like that, should have just let me stab him . . .

3

Homeboy that blasted him too at the same time." Hunter told Meadows he obtained a half an ounce of drugs, and that the weapon used was in San Diego.

Heather Strauch, who had been arrested and charged with Sahagun's murder as well as burglary and attempted robbery, testified that in March 2011, she saw that her boyfriend, Joseph Verkade, had obtained a shotgun. Strauch knew Yorba at the time. On March 31, 2011, Strauch received a call from Yorba, who said she had been ripped off and wanted to collect what was owed her. Yorba then spoke with Verkade, telling him she needed backup. Verkade confirmed with Yorba that he needed to bring his shotgun, and he, Strauch and Michael Gault prepared to leave in Gault's pickup truck to meet with Yorba, with Verkade's shotgun wrapped in clothing on the floorboard in the back of the truck. They arrived at a motel where Yorba, Hunter and Jason Breer[2] came out and entered the truck. Hunter sat next to Yorba in the backseat. Strauch placed the shotgun between her legs.

During their drive, the group discussed the plan: Yorba was going to go in first to talk to the man and Verkade, Hunter and Breer would come in afterwards so it would not be obvious that they were together. Shortly before arriving at the residence, Yorba said she wanted the man to be scared so they could rob him without anyone having to get hurt. Gault parked a couple of houses away from the house, and everyone was exiting the truck when Verkade took the shotgun from Strauch, who handed it to him in the front seat. Strauch told Verkade to be careful because the gun was loaded. At that point, Yorba,

---

2      The probation officer's post-sentence report indicates that Jason's last name was Greer. Witnesses at trial described Jason's last name as "Breer."

Hunter and Breer were standing right by the truck's open doors.  Verkade left the truck and he, Yorba, Hunter and Breer walked up to the house.  The next thing Strauch heard was a gunshot.  After everyone had entered the truck, Breer asked Hunter several times, "Where is it?" and Hunter began digging around his own pockets, saying, "I stabbed him after you shot him before I went into his pockets."

At about the time of the shooting, Frances Sahagun, who realized her husband was not in the house, looked out the window and saw three people by her driveway who looked like they had been running.  She heard a female voice say, "I told you so," and the individuals disappeared.  Frances Sahagun ran to the garage, where she found her husband on the floor.

The county chief deputy medical examiner determined Sahagun died from a shotgun wound to his chest.  He also observed a linear defect in Sahagun's wound that could have been from the shotgun blast or evidence of a possible stabbing.

Hunter was interviewed by a police officer on two occasions after his arrest.  He told the officer he had come up with the plan, which was to scare Sahagun, who was then supposed to hand over money without a fight.  In another interview, Hunter told the officer they had discussed the robbery for four days beforehand, and he knew they were going to rob Sahagun before he got into Gault's truck.  Hunter stated the plan was to just walk in and walk out without violence, but before entering Sahagun's garage, he saw Verkade had brought a sawed-off shotgun.  Hunter recounted that when Strauch handed him the gun, she told him it was loaded with a single shot.  He said Verkade shot Sahagun and they ran.

5

On April 5, 2011, Hunter called Meadows from jail and they spoke about the incident. Hunter admitted he was involved and had stabbed the victim in the heart, though he claimed he did not stab him "that bad." Hunter also told Meadows he had struck the victim in the face; that he "knocked him in the head and . . . the dude . . . blew his . . . guts all over the room." Hunter also called another man. Hunter admitted he was there when the victim was killed, and explained that the man "was suppose [*sic*] to just be a . . . push over and he jumped out of the . . . chair with a . . . 45," "[s]o he got his stomach . . . blown to pieces." When the man said the news had reported Hunter had stabbed the man, Hunter replied, "Yeah, that happened too."

The next day, while housed in a medical unit, Hunter described his charges to Deputy Sheriff Robert Rudisill, who was working in that unit. Deputy Sheriff Rudisill replied, "Wow." Hunter then told Rudisill there were three of them in the garage and two of them had weapons; that he had the knife, not the shotgun.[3]

---

3    At Hunter's preliminary hearing, Deputy Rudisill testified that in April 2011 he was assigned to the Vista Detention Facility's medical unit and saw Hunter had trash in his cell. After the deputy asked Hunter to gather the trash and got a trash can for him, the deputy asked Hunter why he was in the medical unit. Hunter responded, "I'm here for a 187. I'm going down for life." Deputy Rudisill responded, "Wow." Hunter then said, "There is three of us [*sic*] in the garage, two of us had weapons. I had the knife, not the shotgun." Before trial, the court excluded Hunter's statement: "I'm here for a 187. I'm going down for life." The court permitted Hunter's other statement only against Hunter, not against his codefendants.

DISCUSSION

## I. *Special-Circumstance Finding*

Hunter contends the evidence is insufficient to sustain the jury's verdict on the special-circumstance allegations. He points out Yorba "instigated" the chain of events leading to Sahagun's murder, and he was neither essential to the scheme nor could he anticipate the shooting because "no evidence suggested any violence was contemplated before the robbery." According to Hunter, as a result the jury could not determine that he harbored an intent to kill or, as an aider and abettor, was a major participant in the robbery and acted with reckless indifference to life.

## A. *Standard of Review*

Well settled standards apply to Hunter's sufficiency of the evidence challenge. We determine " ' "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citations.] We examine the record to determine "whether it shows evidence that is reasonable, credible and of solid value from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] Further, "the appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." [Citation.] This standard applies whether direct or circumstantial evidence is involved. "Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a

reasonable doubt. [Citation.] ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' " ' " (*People v. Virgil* (2011) 51 Cal.4th 1210, 1263.) Reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

We review a challenge to the sufficiency of the evidence to support a special-circumstance finding in the same manner as a challenge to the sufficiency of the evidence to support a conviction. (*People v. Cole* (2004) 33 Cal.4th 1158, 1229; see *People v. Burney* (2009) 47 Cal.4th 203, 253 [applying standard to support felony murder predicated on robbery].)

B. *Law*

"Under the felony-murder rule, a murder 'committed in the perpetration of, or attempt to perpetrate' one of several enumerated felonies, including robbery, is first degree murder. [Citation.] The robbery-murder special circumstance applies to a murder 'committed while the defendant was engaged in . . . the commission of, [or] attempted commission of' robbery. [Citation.] '[T]o prove a felony-murder special-circumstance allegation, the prosecution must show that the defendant had an independent purpose for the commission of the felony, that is, the commission of the felony was not merely incidental to an intended murder.' [Citations.] To prove a robbery-murder special

8

circumstance, the prosecution must prove the defendant formed the intent to steal before or while killing the victim."  (*People v. Lindberg* (2008) 45 Cal.4th 1, 27-28.)[4]

When the defendant is an accomplice rather than the actual killer, the People must plead and prove the defendant either intended to kill (§ 190.2, subd. (c)) or acted with "reckless indifference to human life" while a "major participant" in the underlying felony. (§ 190.2, subd. (d)[5]; see *People v. Thompson* (2010) 49 Cal.4th 79, 125-126 [for special circumstances based on the enumerated felonies in paragraph (17) of subdivision (a) of § 190.2, which includes robbery, an aider and abettor must have been a major participant and have acted with reckless indifference to human life].)  " '[T]he culpable mental state of "reckless indifference to life" is one in which the defendant "knowingly engage[es] in criminal activities known to carry a grave risk of death" . . . .'  [Citation.]  This mental state thus requires the defendant be '*subjectively* aware that his or her participation in the

_____

4      " '[A] jury deciding the truth of the special circumstance allegation is not required to assign a hierarchy to the defendant's motives in order to determine which of multiple concurrent intents was "primary," but instead the jury need only determine whether commission of the underlying felony was or was not merely incidental to the murder.' [Citation.]  '[A] "concurrent intent to kill and to commit an independent felony will support a felony-murder special circumstance." ' "  (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1326-1327.)

5      Subdivision (d) of section 190.2 states:  "Notwithstanding subdivision (c), every person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraph (17) of subdivision (a) which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole if a special circumstance enumerated in paragraph (17) of subdivision (a) has been found to be true . . . ."

9

felony involved a grave risk of death.' " (*People v. Mil* (2012) 53 Cal.4th 400, 417, quoting *People v. Estrada* (1995) 11 Cal.4th 568, 577.)

C. *Analysis*

Hunter does not challenge the sufficiency of the evidence of his conviction for murder in the first degree, or the attempted robbery or burglary. He maintains only that he was neither a "major participant" in the robbery nor played a major role in it, and, under *People v. Hodgson* (2003) 111 Cal.App.4th 566, given the number of individuals involved, his presence was not critical to its success. Citing *People v. Proby* (1998) 60 Cal.App.4th 922, he argues that because he did not provide the weapon or have any subjective awareness Verkade would resort to deadly force, there is no evidence he acted with knowledge or appreciation of the grave risk to human life created by his participation in the underlying felony. Finally, Hunter argues that the firing of a single shotgun shot to Sahagun's chest happened too quickly for him to intervene or render aid.

None of these contentions warrant reversal of the jury's special-circumstance finding. Courts have found substantial evidence of reckless indifference to life under circumstances where, as here, a defendant, knowing about the presence of a weapon, has continued to assist with a violent robbery and/or flee rather than come to the injured victim's aid. (See *People v. Lopez* (2011) 198 Cal.App.4th 1106, 1115-1118 [shooter's testimony that accomplice knew he had a gun and was with him when he picked it up, as well as evidence the accomplice may have been planning to "jack" the victim behind his back supported jury's conclusion she acted with reckless indifference to the life of the man she lured into the alley]; *People v. Smith* (2005) 135 Cal.App.4th 914, 927-928,

10

overruled on other grounds as stated in *People v. Garcia* (2008) 168 Cal.App.4th 261, 291-292; *People v. Hodgson*, *supra*, 111 Cal.App.4th at pp. 579-580 [defendant helped his codefendant, who planned to rob the victim, by holding a garage door open and after hearing a shot, continued to assist by trying to keep the garage gate from closing until the codefendant could escape with the loot; the "appellant's role was more 'notable and conspicuous'—and also more essential—than if the shooter had been assisted by a coterie of confederates"]; *People v. Proby*, *supra*, 60 Cal.App.4th at p. 929 [defendant knew of codefendant's willingness to do violence and provided him with a gun, and continued to rob a restaurant, took money and left after the codefendant shot the victim in the back of the head]; *People v. Mora* (1995) 39 Cal.App.4th 607, 617 [defendant helped plan a night-time armed invasion, gave his accomplice a rifle, and personally carried the loot, leaving one victim to die and threatening another; appellate court held that even if the jury believed the defendant did not intend the victim to be killed, he was aware of the "risk of resistance to such an armed invasion of the home and the extreme likelihood death could result"]; *People v. Bustos* (1994) 23 Cal.App.4th 1747, 1754 [sufficient evidence for special circumstance found where defendant was involved in planning the robbery, knew another codefendant had a knife, went into the restroom and struggled with the victim who was stabbed, and "fled together with his accomplices and the robbery loot, leaving the victim to die"].)

Here, the jury was properly instructed on the principles pertaining to proof of a special circumstance as to an accomplice. Evidence from Strauch, as well as Hunter's own admissions in phone calls and interviews that Hunter had participated in the

11

planning of Sahagun's robbery and knew beforehand the robbery was going to occur, plus his role as one of the three men whose presence was supposed to scare Sahagun into submission, is substantial evidence that he had a conspicuous role and acted as a major participant in the robbery. (Accord, *People v. Bustos*, *supra*, 23 Cal.App.4th at p. 1754; *People v. Proby*, *supra*, 60 Cal.App.4th at p. 929.) A major participant need not be armed or participate in the actual taking (*People v. Hodgson*, *supra*, 111 Cal.App.4th at p. 579), nor is a major participant required to be the "ringleader." (*Proby*, at p. 934.)

Further, Hunter proceeded to participate in the attempted robbery and burglary knowing Verkade was armed with the shotgun, and was present in the garage while Verkade wielded it at Sahagun. He knew of the plan to scare Sahagun enough so he would readily give up his drugs and money. To this end, Verkade used the shotgun in an attempt to subdue Sahagun. And the use of a weapon to effect the robbery presented a grave risk of death. Hunter simply fled with the others after Sahagun's shooting. This constitutes substantial evidence Hunter knowingly engaged in criminal activity involving a grave risk of death. (*People v. Mil*, *supra*, 53 Cal.4th at p. 417; *People v. Lopez*, *supra*, 198 Cal.App.4th at pp. 1115-1116; *People v. Bustos*, *supra*, 23 Cal.App.4th at pp. 1751, 1754-1755.)

II. *Admission of Hunter's Statements to Deputy Sheriff Rudisill*

Hunter contends the trial court erred by denying his motion to exclude the incriminating statements he made to Deputy Rudisill; that under the relevant legal standards he was in custody, subjected to custodial interrogation for purposes of *Miranda*, and should have been given warnings before he gave those statements. Hunter

12

argues admission of his statement was not harmless beyond a reasonable doubt given the weakness of the prosecution's case as to the special-circumstance allegations, and thus his admission to Deputy Rudisill that he possessed a knife during the crimes may have been critical to the jury's conclusion.

A. *Applicable Legal Principles*

In *Miranda*, *supra*, 384 U.S. at p. 444, the United States Supreme Court declared that a person questioned by law enforcement officers after being "taken into custody or otherwise deprived of his freedom of action in any significant way" must first "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Under *Miranda* and its progeny, certain evidence obtained during custodial interrogation is inadmissible for certain purposes in a criminal trial. (*People v. Thornton* (2007) 41 Cal.4th 391, 432; *People v. Nelson* (2012) 53 Cal.4th 367, 374.)

"The phrase 'custodial interrogation' is crucial. . . . The noun 'refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.' " (*People v. Mickey* (1991) 54 Cal.3d 612, 648; *People v. Mayfield* (1997) 14 Cal.4th 668, 732.) For police questioning to be " 'interrogation,' " it must go beyond questions "normally attendant to arrest and custody," i.e., "the police should know [the questions] are reasonably likely to elicit an incriminating response . . . ." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301, fns. omitted.)

13

Neither spontaneous nor volunteered statements are the products of interrogation; thus they are not barred by the Fifth Amendment or subject to the requirements of *Miranda*. (*People v. Thornton*, *supra*, 41 Cal.4th at p. 432; *People v. Ray* (1996) 13 Cal.4th 313, 337; *People v. Franzen* (2012) 210 Cal.App.4th 1193, 1201 [*Miranda* is not violated where a defendant volunteers incriminating statements as part of a "casual conversation"]; *People v. Mickey*, *supra*, 54 Cal.3d at p. 648; *People v. Edwards* (1991) 54 Cal.3d 787, 815 ["[V]olunteered statements not the product of interrogation are admissible."]; *People v. Gamache* (2010) 48 Cal.4th 347, 388 ["small talk is permitted"].) And, a police officer is not obligated to prevent a suspect from volunteering incriminating statements. (*Edwards*, 54 Cal.3d at p. 816.) "Absent 'custodial interrogation,' *Miranda* simply does not come into play." (*People v. Mickey*, at p. 648.)

B. *Analysis*

We review de novo the trial court's decision denying Hunter's motion to suppress under *Miranda*. (*People v. Waidla* (2000) 22 Cal.4th 690, 730; *People v. Roldan* (2005) 35 Cal.4th 646, 735, overruled on other grounds as stated in *People v. Doolin* (2009) 45 Cal.4th 390, 421 & fn. 22.) Doing so, we agree with the trial court that Hunter was not subjected to interrogation by Deputy Rudisill's mere remark, "Wow." Deputy Rudisill's neutral remark was not one designed to elicit an incriminating response; it was a "natural conversational response" to defendant's own statements. (Accord, *People v. Franzen*, *supra*, 210 Cal.App.4th at p. 1203 [detective's response, "What guy?" to exchange initiated by the defendant was a normal response to the defendant's conversational opening; it was not interrogation as commonly understood or contemplated by California

14

Supreme Court authority].)  Hunter's response, which was gratuitously volunteered, was admissible.  Thus, the trial court did not err in declining to exclude it from evidence.

### III.  *Refusal to Dismiss Hunter's Prior Strike Conviction*

Hunter contends the trial court abused its discretion by refusing to dismiss his 2009 residential burglary conviction in the furtherance of justice.  He points out the burglary did not involve actual violence and he had received probation for it.  He also maintains his close relationship with his family suggested he was not beyond rehabilitation, and his psychological problems mitigated his culpability.  He argues the trial court did not adequately consider his background and culpability in making its decision.

In denying Hunter's oral request, the trial court initially observed it was an "academic exercise" in that it did not think the strike prior conviction would affect Hunter's sentence.  It acknowledged that in order to dismiss the strike, it would have to find Hunter fell outside the purview of the "Three Strikes" law sentencing scheme or did not fall within its spirit.  The court reasoned that while Hunter's strike "was nonviolent in that there was no violence on the individual" it was still "legally a violent offense because of the [section] 667.5, [subdivision] (c)(21) allegation that was attached."  The court further pointed out Hunter's crime was recent and he was still on probation for it.  For those reasons, the court declined to exercise its discretion to dismiss the prior strike.

### A.  *Legal Principles*

Section 1385, subdivision (a) provides in part that a trial court "may, either of [its] own motion or upon the application of the prosecuting attorney, and in furtherance of

15

justice, order an action to be dismissed."  That provision permits a court to strike prior felony conviction allegations in cases brought under the Three Strikes law.  (*People v. Superior Ct.* (*Romero*) (1996) 13 Cal.4th 497, 529-530 (*Romero*).)  However, a "court's discretion to strike prior felony conviction allegations in furtherance of justice is limited.  Its exercise must proceed in strict compliance with section 1385[, subdivision] (a), and is subject to review for abuse."  (*Id.* at p. 530; *People v. Carmony* (2004) 33 Cal.4th 367, 374 (*Carmony*); *In re Large* (2007) 41 Cal.4th 538, 550.)

In reviewing for abuse of discretion, we are guided by two principles.  First, " ' "[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary." ' "  (*Carmony*, *supra*, 33 Cal.4th at pp. 376-377.)  Without this showing, the trial court " ' "is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." '  [Citations.]  Second, a ' "decision will not be reversed merely because reasonable people might disagree.  'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' " ' "  (*Ibid.*)  Thus, "a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it" or if " 'the sentencing norms [established by the Three Strikes law may, as a matter of law,] produce[ ] an "arbitrary, capricious, or patently absurd" result' under the specific facts of a particular case."  (*Id.* at pp. 377, 378.)  " '[W]here the record demonstrates that the trial court balanced the relevant facts and reached an impartial decision in conformity with the

16

spirit of the law, we shall affirm the trial court's ruling, even if we might have ruled differently in the first instance.' " (*Id.* at p. 378.)

To determine whether to strike an allegation "in furtherance of justice," the court must balance " ' "the constitutional rights of the defendant, and the interests of society represented by the People." ' " (*Romero*, *supra*, 13 Cal.4th at pp. 530-531, italics omitted.) "[A] court abuses its discretion if it dismisses a case, or strikes a sentencing allegation, solely 'to accommodate judicial convenience or because of court congestion.' [Citation.] . . . Nor would a court act properly if 'guided solely by a personal antipathy for the effect that the three strikes law would have on [a] defendant,' while ignoring 'defendant's background,' 'the nature of his present offenses,' and other 'individualized considerations.' " (*Id*. at p. 531.) In deciding whether to dismiss a strike prior " 'in furtherance of justice' . . . the court in question must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he [or she] had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161 (*Williams*); see also *In re Large*, *supra*, 41 Cal.4th at p. 552.)

B. *Analysis*

Under the above-summarized standards, it is not our role to decide the merits of Hunter's request anew, but rather to assess whether the court patently abused its discretion in balancing "the nature and circumstances of [his] present felonies and prior

17

serious and/or violent felony convictions, and the particulars of [his] background, character, and prospects." (*Williams*, *supra*, 17 Cal.4th at p. 161.) "The concept of discretion implies that, at least in some cases, a decision may properly go either way." (*In re Large*, *supra*, 41 Cal.4th at p. 553.) In keeping with this principle, the fact Hunter can make a good argument for striking his strike prior in the furtherance of justice does not require reversal. (*Carmony*, *supra*, 33 Cal.4th at p. 378 [it is not enough to show that reasonable people might disagree about whether to strike one or more prior conviction allegations].) Further, the trial court was not required to state reasons for denying the motion. (*In re Large*, *supra*, 41 Cal.4th at p. 550.)[6] Hunter "finds himself in the difficult position of having to rebut the 'strong presumption' [citation] that the trial judge properly exercised its discretion in refusing to strike a prior conviction allegation." (*In re Large*, at p. 551.)

Having reviewed the record, we conclude Hunter cannot show the trial court's decision was arbitrary or capricious or the result absurd given the facts of this case. The court had before it the details of Hunter's criminal history, the nature of Hunter's 2009 strike, and the nature of his current offenses. It was within reason for the court to

---

6    "While a court must explain its reasons for striking a prior [citations], no similar requirement applies when a court declines to strike a prior [citation]. 'The absence of such a requirement merely reflects the legislative presumption that a court acts properly whenever it sentences a defendant in accordance with the three strikes law.' [Citation.] 'Thus, the three strikes law not only establishes a sentencing norm, it carefully circumscribes the trial court's power to depart from this norm and requires the court to explicitly justify its decision to do so. In doing so, the law creates a strong presumption that any sentence that conforms to these sentencing norms is both rational and proper.' " (*In re Large*, *supra*, 41 Cal.4th at p. 550.)

18

conclude, under all of the circumstances, Hunter was not wholly "outside the scheme's spirit" (*Williams*, *supra*, 17 Cal.4th at p. 161), and that it should not strike Hunter's prior strike. We cannot say the court's refusal to strike his strike prior was "so irrational or arbitrary that no reasonable person could agree with it." (*Carmony*, *supra*, 33 Cal.4th at p. 377.)

## DISPOSITI'ON

The judgment is affirmed.

O'ROURKE, J.

WE CONCUR:

McCONNELL, P. J.

IRION, J.

19