Filed 3/17/16

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C069965 |
| Plaintiff and Respondent, | (Super. Ct. No. 08F03645) |
| v. | |
| ANTHONY ARTURO MEDINA et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Michael A. Savage, Judge.  Affirmed as modified.

Maribeth Halloran, under appointment by the Court of Appeal, for Defendant and Appellant Anthony Arturo Medina.

Michael Satris, under appointment by the Court of Appeal, for Defendant and Appellant David Valentino Whitehead.

---

* Under California Rules of Court, rules 8.1105 and 8.1110, only the Facts, part III of the Discussion, and the Disposition are certified for publication.

Sharon Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant Brandon Theodore Morton.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine A. Chatman, Angelo S. Edralin, Deputy Attorney General, for Plaintiff and Respondent.

This case returns to us on remand from the California Supreme Court for reconsideration in light of *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*), which articulated the standards to apply in determining whether an accomplice who lacks the intent to kill may qualify as a major participant for purposes of the felony-murder special circumstance. On further consideration, we modify our earlier opinion as hereinafter set forth.

This case arises from two separate incidents. In the first, defendant Anthony Medina was driving down Florin Road, with defendants Brandon Morton and David Whitehead in the back seat, and fired a gun at a black Lexus, hitting its two occupants. Medina was convicted of two counts of attempted murder and shooting into an occupied vehicle. In the second incident, Morton believed he had been "shorted" several grams of methamphetamine in a drug sale. Morton, with Medina and Whitehead, met with the woman who had made the sale. She was accompanied by her boyfriend Jason Fletcher and another man. Morton shot and killed Fletcher. All three defendants were convicted of first degree murder with a robbery special circumstance and attempted robbery. Sentenced to life in prison without the possibility of parole (LWOP), they appeal, raising a myriad of contentions including insufficiency of the evidence, evidentiary errors, and instructional error. In particular, Medina and Whitehead contend insufficient evidence supports the special circumstance. Whitehead also raises procedural errors regarding the denial of his motions to sever and to continue his sentencing, and contends his sentence is cruel and unusual.

2

We agree with defendants' contentions relating to presentence custody credit and Whitehead's request for correction of his abstract of judgment.  We modify the judgments to award presentence custody credit and to correct unauthorized sentences, and order corrections and amendments to the abstracts of judgment.  We affirm the judgments as modified.

## FACTS

*May 2, 2008*, *Shooting*

In May 2008, 15-year-old Brittany Sarantis was living with 19-year-old defendant Medina.  In the early morning of May 2, Medina was driving Sarantis's Impala; Sarantis was in the passenger seat and defendants Morton and Whitehead were in the rear seat, along with Sarantis's cousin, 15-year-old Waylon Rocha.  They had just left a liquor store and were driving down Florin Road.  A black Lexus was driving erratically, close to the Impala, and appeared out of control.  The car would speed up to right behind them and then brake.  The occupants of the Impala were concerned and frightened.

Medina pulled into a left turn lane and stopped, letting the Lexus pass by.  Then, instead of turning, he continued to drive straight, running a red light and following the Lexus.  Medina drove up beside the Lexus at a stop light.  Sarantis lay down in her seat and Medina reached across her and fired several shots into the Lexus.

Angelo Granados was driving the black Lexus and Miguel Ramos was his passenger.  Ramos was shot in the knee, requiring stitches.  Granados was shot in the upper thigh.  Both were taken to the hospital and were in great pain when first interviewed by the police.

Detective Thomas Higgins interviewed Sarantis about the shooting. She told him that Morton handed Medina the gun used for the shooting, but later said she did not actually see Morton hand over the gun. She told the police Morton had a gun out and had said, "if they pull up beside us, I'll get them."

Detective Higgins also interviewed Armando Mora, who knew Medina, Morton and Whitehead. Mora was on parole in April 2008. He told the police he heard Medina was trying to buy a gun at that time and told him, " 'Hell, no, you can't do that here.' " Medina responded, " 'fool, you know wherever I am I'm strapped' " and pulled out a gun. Mora also told the police that after the shooting, Medina, Whitehead, and "the little white dude" showed up and Medina said they "got into it with some guy on Florin" and Medina "busted on him," meaning he shot at him.

After Medina was arrested he called Sarantis and asked her where the Impala was, telling her the police wanted to know. She told him where it was parked. Detectives subsequently asked her to bring the Impala to them, but it had been stolen the night after Medina's call.

Sarantis claimed she saw Ramos after the shooting and he threatened to kill her.

*May 5, 2008, Killing*

Morton sold drugs for a living. He gave his girlfriend Holly Sarmento $700 to buy a half ounce of methamphetamine for him to resell. She was to get the drugs through her best friend, Jennifer Cauble. On the afternoon of May 4, Sarmento, Cauble, and a man named Tim went together to purchase the methamphetamine. Sarmento claimed Cauble told her that Tim had put some money in for the purchase, so he received a chunk of the methamphetamine, and she and Cauble smoked $20 worth of the drug in Oak Park. Cauble did not recall either of these events.

Sarmento took the methamphetamine from Cauble to Morton's. That night, he called her and told her the drugs were short. He wanted her to meet with Cauble to settle the matter. Cauble told Sarmento that her boyfriend Jason Fletcher would take her to meet with Morton.

After several discussions by telephone, Cauble and Morton decided to meet near a post office. Morton drove with Sarmento to the meeting in her parents' car. Sarmento recalled seeing Whitehead nearby when they left. Fletcher drove Cauble; his "homey" Marty Rainville came too as "muscle." It was around midnight when they met.

Morton got out of the car and spoke with Fletcher; he then got in the back seat of Fletcher's car. Morton had a scale and he gave the methamphetamine to Cauble to weigh. She told him it was short. Cauble noted the drugs appeared to be a different consistency from those she had bought. Morton called Sarmento over and asked if the drugs were the same; she said yes. Cauble told Morton she could "fix it," that is, get his money back.

Morton and Rainville were arguing. Rainville had his hands in his sweatshirt and Morton thought he had a gun. Rainville denied he had anything. Then a car pulled up with Medina and Whitehead inside. Morton got out of Fletcher's car and pulled out a gun. Whitehead pulled a gun on Cauble. Cauble believed all three men had guns, but Sarmento was not sure that Medina did.

Morton ordered everyone out of Fletcher's car. Morton, Medina, and Whitehead walked Fletcher and Rainville across the street at gunpoint. Rainville took off his jacket and hung it on the tailgate of a truck. There was a knife inside.

According to Cauble, when Morton ordered them out of the car, he told Fletcher to leave the car keys. Morton returned to the car, but the steering column had been tampered with and Morton could not start the car. He asked Cauble how to start it, but she would not tell him. Morton was angry and ran to Fletcher. He yelled at Sarmento to get in her parents' car. Whitehead got in to drive and the two drove away. Medina had

5

returned to his car. Morton shot Fletcher twice. Whitehead and Sarmento heard the two shots and Whitehead turned the car around and returned. They encountered Medina and Morton leaving the scene together and turned around again to follow them away. Later, Morton got into the car with Sarmento and Whitehead joined Medina in the other car.

Cauble and Rainville knocked on doors, trying unsuccessfully to get help for Fletcher. Rainville broke a window in one house. Finally, they took Fletcher to the hospital, where he died of a gunshot wounds to his left shoulder and chest.

*Morton's Letter*

In 2009, a deputy sheriff searched Morton's jail cell and found a letter. The letter stated: "This is what I need the witness to say so that I can get unperfect [*sic*] self-defense which only holds ten years." The letter stated the witness should be female, preferably older. It outlined what the witness should say--that she saw a white guy on a porch shoot--and how she should answer certain questions. The letter included a map of the area of the shooting.

*Medina's Defense*

Rocha testified that when he saw the Lexus driving erratically on Florin Road, he got down for his safety. He was concerned due to the area and "knowing Sacramento." Before the shooting, the driver's window of the Lexus came down and Rocha saw a hand reach down low. Someone in that car said, "[i]s that them"?

Medina testified he shot into the Lexus for "[f]ear of my life." When he saw the Lexus coming up fast and swerving, he grabbed his gun and put it in his lap. He felt they "were going to do something." When he pulled up next to the car at the stop light, everyone in his car was down and he heard someone in the other car ask, " '[I]s that him right there?' " He saw the driver put his hands under the seat and come up fast. Medina reached over and fired.

Medina explained he had problems with a gang that claimed the Franklin Boulevard area. He had been a member of the gang, but had left it and now they were trying to kill him. Gang members had called him and threatened him and they had shot at his brother.

On May 4, Medina had weighed the methamphetamine Sarmento brought back from Cauble and told Morton it was five grams short. When Morton left to get his money back, he asked Medina if he wanted to come. Medina drove separately with Whitehead, who had asked if he could go. Medina claimed he did not have a gun. His intention was to make sure Morton got his money back.

When Medina and Whitehead arrived at the meeting, Morton told them to "watch the white boy, I think he's got a gun." Morton told Rainville (who was White) to take off his jacket. When Whitehead put his gun down and went to the car, Medina got in his own car and started to leave. Morton told him to wait. Medina was turning around when he heard gunshots. He slammed on the brakes because he thought he might get shot; the shots were "real close." Morton jumped in the car with Medina and they drove off. When they stopped to switch cars, Medina was angry with Morton and told him to "[g]et the fuck out of the car."

It was stipulated that when Fletcher's car was impounded, there were 10 grams of methamphetamine and a scale inside.

*Morton's Defense*

Cauble had smoked methamphetamine with Fletcher the day of the shooting; they were smoking all the time. Fletcher's blood analysis at his autopsy showed a methamphetamine level of 2.5 milligrams per liter, an extremely high level. Experts testified a therapeutic level is 0.01-0.05 milligrams per liter; anything above 0.1 or 0.2 milligrams per liter is considered an abuse level. The recreational use of methamphetamine keeps one awake and very energetic. A user may misperceive his

environment and become aggressive, violent, unpredictable, and have delusions and anxiety disorder.

A young girl who lived near the shooting testified she heard glass breaking and people fighting that night of the murder. She heard punching and people saying, "[H]ow do you like that?" She heard glass break and then banging.

Morton testified that on May 2, he was fearful of the Lexus's aggressive driving. He heard someone say, "where's my gun?" or something similar, but denied he handed Medina a gun. He heard someone in the other car say, "is that that nigger right there?" and thought they meant him as he was the only African-American. After the shooting, Medina handed him a gun and Morton put it in the trunk.

When Morton was in the backseat of Fletcher's car on May 5, the first thing he did was hand Fletcher the drugs to weigh. Rainville was fidgeting at his waist and Morton asked if he had a gun. Morton saw a handle of what he thought was a knife. When Cauble claimed it was "different dope," Morton believed she was trying to "pump up" Fletcher and Rainville into believing Morton had switched the dope and was scamming them. Fletcher was high, talking fast and switching subjects. He said he did not "do business with niggers" and "I stay with mine." Cauble had testified Fletcher did not like Black people.

Morton claimed that when he got out of the car and pulled a gun, he was thinking only to get his drugs back. He told Sarmento to "get out of there." Morton told Cauble to get his drugs and then he put his gun in his sweatshirt. Fletcher grabbed Morton's sweatshirt and they began "tussling." Morton pushed Fletcher off and might have kicked him. Fletcher fell and when he started to get up, Morton saw him reaching for something and shot him. Morton thought Fletcher was grabbing for a gun. After the shooting, he jumped into Medina's car. He threw the gun away the next day.

Morton claimed he wrote the letter about the witness he needed because he was "terrified" after he received Cauble's statement.

8

*Convictions and Sentencing*

As to the events of May 2, the jury found Medina guilty of two counts of attempted first degree murder (Pen. Code, §§ 664/187, subd. (a))[1] with enhancements for discharging a firearm and causing great bodily injury (§12022.53, subd. (d)), and one count of shooting at an occupied vehicle (§ 246) with the same two firearm enhancements. The jury also found Medina guilty of unlawful possession of a firearm. (Former § 12021, subd. (a).) It had been stipulated that Medina had a felony conviction. As to the events of May 5, the jury found Medina guilty of first degree murder (§ 187, subd. (a)) and found the attempted robbery special circumstance true (§ 190.2, subd. (a)(17)(A)), but found not true the attempted carjacking special circumstance (§ 190.2, subd. (a)(17)(L)) and the personal use of firearm enhancement (§ 12022.53, subd. (b)). It found Medina guilty of attempted robbery (§§ 664/211), but not guilty of either attempted carjacking (§§ 664/215), or unlawful possession of a firearm (former § 12021, subd. (a)).

The court sentenced Medina to LWOP on the murder count, and to life plus 25 years to life on each of the two attempted murder counts. Sentence on the other counts was stayed pursuant to section 654.[2] The aggregate sentence was LWOP plus 64 years to life.

The jury acquitted Morton of all counts arising from May 2, except unlawful possession of a firearm. It had been stipulated that Morton had a felony conviction. The jury found Morton guilty of first degree murder with an attempted robbery special circumstance and a personal discharge of a firearm enhancement, attempted robbery, and unlawful possession of a firearm arising from the events of May 5. It acquitted him of

---

[1] Further undesignated statutory references are to the Penal Code.

[2] As we explain in Part XII, *post*, the court failed to impose sentence on certain counts, improperly implementing section 654 by staying imposition rather than execution of sentence.

the attempted carjacking and the related special circumstance. The trial court found Morton had a strike prior.

The court sentenced Morton to LWOP plus 25 years to life on the murder charge, stayed the sentence pursuant to section 654 on the other counts from May 5, and sentenced him to six years (three years doubled) for the May 2 unlawful possession of a firearm. His aggregate prison sentence was LWOP plus 31 years to life.

The jury found Whitehead guilty of first degree murder with an attempted robbery special circumstance and a personal use of a firearm enhancement (§ 12022.53, subd. (b)), and attempted robbery. It acquitted him of the attempted carjacking special circumstance and charge. The court sentenced him to LWOP on the murder count plus 10 years for the enhancement. It stayed the sentence on the attempted robbery.

## DISCUSSION

### I

### *Severance*

Whitehead contends the trial court erred by denying his motion to sever the counts in which he was a named defendant (counts 1 through 3, occurring May 5) from those counts occurring on May 2 (counts 6 through 10, the May 2 crimes). He argues he was prejudiced by substantial evidence that was not admissible against him, resulting in verdicts based on guilt by association.

A. *Background*

Whitehead moved to sever the May 2 crimes from counts 1 through 3. He claimed evidence of the May 2 crimes was not cross-admissible and he would be prejudiced by guilt by association. The People argued joinder was proper because the crimes were connected; they all involved the presence of the same three defendants, the same car, and guns. The People also argued the evidence of the May 2 crimes was admissible against Whitehead to show his knowledge, for purposes of applying the natural and probable consequences doctrine.

10

The trial court denied Whitehead's motion for severance (as well as the severance motions by the other defendants). The court found the crimes were of the same class; the same three defendants were together and shootings occurred both days. As to Whitehead not being charged in the May 2 crimes, the court opined, without further explanation, that in its experience juries were "very capable of holding the prosecution's fe[e]t to the fire" to prove specific charges.

B. *The Law*

Section 954 provides in relevant part: "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately. . . ."

Assaultive crimes against the person are " 'offenses of the same class' " and expressly made joinable by section 954. (*People v. Miller* (1990) 50 Cal.3d 954, 987 [murder and attempted murder]; *People v. Walker* (1988) 47 Cal.3d 605, 622 [robbery, murder, and assault with intent to commit murder]; *People v. Thomas* (1990) 219 Cal.App.3d 134, 140 [attempted murder and ex-felon in possession of firearm].)

Where the statutory requirements for joinder are clearly met, defendant must make a clear showing of prejudice to establish error. (*Williams v. Superior Court* (1984) 36 Cal.3d 441, 447.) In *Williams*, our Supreme Court stated several factors to be considered in deciding whether charges should be severed: (1) the lack of cross-admissibility of evidence; (2) the prejudicial effect of joining one charge with a more inflammatory charge; (3) the prejudicial effect of joining a weak case with a strong case; and (4) whether the People sought to join a charge with a capital offense. (*Id*. at p. 452.)

11

Since *Williams*, the California voters approved Proposition 115, which added section 954.1. That section reads: "In cases in which two or more different offenses of the same class of crimes or offenses have been charged together in the same accusatory pleading, or where two or more accusatory pleadings charging offenses of the same class of crimes or offenses have been consolidated, evidence concerning one offense or offenses need not be admissible as to the other offense or offenses before the jointly charged offenses may be tried together before the same trier of fact."

"Cross-admissibility suffices to negate prejudice, but it is not essential for that purpose. Although ' "we have held that cross-admissibility ordinarily dispels any inference of prejudice, we have never held that the absence of cross-admissibility, by itself, sufficed to demonstrate prejudice.' " [Citation.]" (*People v. Bradford* (1997) 15 Cal.4th 1229, 1316.)

"To demonstrate that a denial of severance was reversible error, defendant must ' "clearly establish that there [was] a substantial danger of prejudice requiring that the charges be separately tried." ' [Citation.] We examine a pretrial severance ruling on the record then before the court. [Citation.] Even if the ruling was correct when made, we must reverse if defendant shows that joinder actually resulted in 'gross unfairness,' amounting to a denial of due process. [Citation.]" (*People v. Arias* (1996) 13 Cal.4th 92, 127.)

C. *Analysis*

Whitehead fails to carry his burden to show prejudice from the failure to sever his charges from the May 2 crimes. The evidence of the May 2 crimes was no more inflammatory than the evidence proving the May 5 murder. Further, the evidence of Whitehead's participation in the murder was not as weak as he contends. The evidence showed that he was armed and willingly joined Medina to aid Morton in settling a drug dispute; several witnesses saw him hold others at gunpoint; and he returned to aid Morton again when he heard shots fired. Some evidence of the May 2 shooting was admissible to

12

show Whitehead's knowledge of Medina and Morton's use of guns and his knowledge and motive in volunteering to help them on May 5, as Whitehead concedes.

In arguing prejudice, Whitehead focuses on the quantity of inflammatory evidence of the unsavory characters of those who testified about the May 2 crimes--Mora, Granados, Ramos, Rocha, Medina, and Morton. Many of them had felony convictions and obviously lied on the stand. In testifying about the May 2 shooting, Medina admitted his former involvement with a criminal street gang. Whitehead's involvement with "unsavory characters," however, was already well established by his connection to Medina and Morton. He had known Medina and Morton for many years and Medina was like a brother. Medina had a felony conviction, lived with an underage girl, was involved in Morton's drug dealing, and admitted he repeatedly lied to the police. Morton admitted he was a drug dealer, had a felony conviction, and carried a gun--at least from the time a previous girlfriend was killed dealing drugs. When Morton was a minor, his mother found a rifle and fake drugs in his room. Morton's girlfriend Sarmento worked as a prostitute and shared her earnings with Morton, had "Brandon's Bitch" tattooed on her back, and used methamphetamine almost daily. Morton shot an unarmed man, with Medina, as well as Whitehead, assisting. The trial court found the brazenness of both Medina and Morton, in their conduct and their "obviously contrived" trial testimony, "remarkable."

Further, the jury's verdicts refute Whitehead's claim of a prejudicial spillover effect because the verdicts demonstrate the jury was able to consider the evidence as to each defendant and each charge in isolation, rather than finding "guilt by association." The jury acquitted Morton of the May 2 crimes, and found Medina did not have a gun on May 5, despite some evidence supporting guilty verdicts on those charges. Cauble testified all three defendants had guns on May 5 and Medina had boasted he was always " 'strapped.' " Whitehead contends it was easy for the jury to acquit Morton of the May 2 offenses because the evidence against him was weak. The evidence, however, was not

13

as weak as Whitehead suggests. Sarantis told the police Morton handed Medina a gun, only later attempting to back away from this statement by saying she did not actually see it. Morton testified he heard someone say, "where's my gun"? While he denied handing Medina a gun, he admitted he put the gun away after the shooting. He admitted he could have said "if they pull up, I'm going to get them" about the occupants of the Lexus and that he was armed on May 2.

The trial court did not err in denying Whitehead's severance motion.

## II

### *Insufficient Evidence of Attempted Robbery*

All defendants contend there is insufficient evidence of attempted robbery. They contend Morton was attempting only to retrieve his *own* drugs from Cauble and Fletcher, so there was no attempt to take the property of another, as required for attempted robbery.

A. *The Law*

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) "[U]nless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction. [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

Section 211 defines robbery as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." "An attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." (§ 21a.) "The act required must be more than mere preparation, it must show that the perpetrator is putting his or her plan into action. That act need not,

14

however, be the last proximate or ultimate step toward commission of the crime. [Citation.]" (*People v. Bonner* (2000) 80 Cal.App.4th 759, 764.)

"A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime. [Citation.]" (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164.)

B. *Sufficient Evidence of Attempted Robbery of Fletcher's Car*

Cauble's testimony provided substantial evidence of attempted robbery of Fletcher's car.[3] When Medina and Whitehead arrived as backup, Morton got out of Fletcher's car and ordered the others out at gunpoint. He told Fletcher to leave the keys. While Medina and Whitehead detained Fletcher and Rainville at gunpoint, Morton attempted unsuccessfully to start the car and asked Cauble how to start it. The only reasonable inference from this evidence is that he was trying to steal the car.

Defendants note the jury acquitted them of attempted carjacking, suggesting the evidence of the attempt to take the car cannot be considered. But we need not ignore the evidence supporting the charge of attempted carjacking to determine if there is sufficient evidence of attempted robbery. "The law generally accepts inconsistent verdicts as an occasionally inevitable, if not entirely satisfying, consequence of a criminal justice system that gives defendants the benefit of a reasonable doubt as to guilt, and juries the power to acquit whatever the evidence." (*People v. Palmer* (2001) 24 Cal.4th 856, 860.) "[I]f an acquittal of one count is factually irreconcilable with a conviction on another, or if a not true finding of an enhancement allegation is inconsistent with a conviction of the substantive offense, effect is given to both. [Citations.]" (*People v. Santamaria* (1994) 8

---

[3] We discuss the attempted robbery of the drugs in Part VII, *post*.

15

Cal.4th 903, 911.) "The jury may have been convinced of guilt but arrived at an inconsistent acquittal or not true finding 'through mistake, compromise, or lenity . . . .' [Citation.]" (*Ibid.*)

"[T]he criminal justice system must accept inconsistent verdicts as to a single defendant. [Citation.] . . . ' "[A] criminal defendant already is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts. This review should not be confused with the problems caused by inconsistent verdicts. Sufficiency-of-the-evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilt beyond a reasonable doubt. [Citations.] This review should be independent of the jury's determination that evidence on another count was insufficient. The Government must convince the jury with its proof, and must also satisfy the courts that given this proof the jury could rationally have reached a verdict of guilt beyond a reasonable doubt. We do not believe that further safeguards against jury irrationality are necessary." ' [Citation.]" (*People v. Superior Court (Sparks)* (2010) 48 Cal.4th 1, 13.)

C. *Sufficient Evidence Medina and Whitehead Aided and Abetted*

Medina and Whitehead contend there is insufficient evidence they shared Morton's intent to rob. They contend the evidence shows the actions of all defendants were directed at negotiating settlement of the disputed drug deal.

Neither presence at the scene of a crime nor failure to prevent its commission is sufficient alone to establish aiding and abetting. (*People v. Stankewitz* (1990) 51 Cal.3d 72, 90.) "Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense." (*In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1094.) "In addition, flight is one of the factors which is relevant in determining consciousness of guilt. [Citation.]" (*Id.* at p. 1095.)

16

Given the violent events of May 2, the jury could easily reject the argument that Medina and Whitehead were ignorant of any intent to commit a violent crime on May 5 where the evidence showed they were prepared to "settle" the dispute and recover drugs or money at gunpoint. Medina and Whitehead were not merely present when Morton tried to steal Fletcher's car, but actively assisted him. Medina and Whitehead joined Morton in walking Fletcher and Rainville across the street at gunpoint and detained them so that Morton could then return to the car and try to take it. They all fled afterwards. Medina waited to serve as Morton's getaway driver after the robbery failed and Whitehead returned to provide further assistance once he heard shots.

Sufficient evidence supports the convictions for attempted robbery, felony murder, and Morton's conviction for the attempted robbery special circumstance.

We next consider the sufficiency of the evidence to support the special circumstance as to Medina and Whitehead.

### III

*Insufficient Evidence of Special Circumstance for Aiders and Abettors*

Medina and Whitehead contend there is insufficient evidence to support the attempted robbery special circumstance as to them. They contend there is insufficient evidence that they each were a major participant in the attempted robbery or that they acted with reckless indifference to life.

A. *The Law*

The special circumstance statute applies not only to actual killers, but also to certain aiders and abettors of first degree murder. (§ 190.2, subds. (c), (d).) An aider and abettor who does not have the intent to kill may still be convicted of special circumstance murder where he "with reckless indifference to human life and as a major participant" aids and abets certain underlying felonies. (§ 190.2, subd. (d).) "The statute thus imposes both a special actus reus requirement, major participation in the crime, and a

17

specific mens rea requirement, reckless indifference to human life." (*Banks, supra,* 61 Cal.4th at p. 798, fn. omitted.)

This language in section 190.2, subdivision (d) is taken from *Tison v. Arizona* (1987) 481 U.S. 137 at page 158 [95 L.Ed.2d 127, 145] (*Tison*): "[W]e simply hold that major participation in the felony committed, combined with reckless indifference to human life, is sufficient" to satisfy the constitutional culpability requirement for death eligibility. These two requirements--having a reckless disregard for human life and being a major participant--will often overlap. (*Ibid.* & fn. 12 [95 L.Ed.2d at p. 145 & fn. 12].) *Tison* defined "reckless disregard for human life" as "knowingly engaging in criminal activities known to carry a grave risk of death." (*Id*. at p. 157; see also *People v. Estrada* (1995) 11 Cal.4th 568, 577.)

In *Banks,* the California Supreme Court considered "under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant so as to be statutorily eligible for the death penalty." (*Banks, supra,* 61 Cal.4th at p. 794.) Our high court reversed the special circumstance finding against Lovie Troy Matthews, who acted as a getaway driver for an attempted robbery of a medical marijuana dispensary that resulted in the shooting death of the dispensary's security guard. (*Ibid.*) The dispensary had a metal security door providing access from the sidewalk and behind that door sat a security guard who verified patients' identification and physician's medical marijuana recommendation before escorting patients through a second locked door. (*Id*. at p. 795.) The dispensary also had surveillance cameras. (*Ibid*.)

Matthews waited in a car blocks away while his three armed confederates entered the dispensary, gained access past the second locked door, and "began tying up employees and searching the premises." (*Banks, supra*, 61 Cal.4th at p. 795.) Shots were fired and the three men fled. A witness outside the dispensary saw the security guard pushing the front door closed from the outside; one of the robbers reached around from the inside and shot the guard, who fell to the ground. The shooter stepped out of the

18

building and shot the guard again. (*Ibid.*) Matthews picked up two of the three perpetrators in his car. (*Id.* at p. 795.) There were a number of telephone calls between Matthews and the shooter before, during, and after the shooting. (*Id*. at pp. 795-796.)

In finding the special circumstance provision did not apply to the evidence presented against Matthews, the court emphasized that "Matthews was absent from the scene, sitting in a car and waiting. There was no evidence he saw or heard the shooting, that he could have seen or heard the shooting, or that he had any immediate role in instigating it or could have prevented it." (*Banks*, *supra*, 61 Cal.4th at p. 805.)

In reaching its conclusion, our high court considered not only *Tison*, but also *Enmund v. Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140], a case on which *Tison* builds. (*Banks, supra,* 61 Cal.4th at p. 799.) The *Banks* court described *Enmund* as follows: "In that case, defendant Earl Enmund purchased a calf from victim Thomas Kersey and in the process learned Kersey was in the habit of carrying large sums of cash on his person. A few weeks later, Enmund drove two armed confederates to Kersey's house and waited nearby while they entered. When Kersey's wife appeared with a gun, the confederates shot and killed both Kerseys. Enmund thereafter drove his confederates away from the scene and helped dispose of the murder weapons, which were never found. He was convicted of robbery and first degree murder and sentenced to death. [Citations.]" (*Banks,* at p. 799.)

The *Enmund* court found a broad consensus against imposing the death penalty "where the defendant did not commit the homicide, was not present when the killing took place, and did not participate in a plot or scheme to murder." (*Enmund v. Florida, supra,* 458 U.S. at p. 795 [73 L.Ed.2d at p. 1150].) The court held the Eighth Amendment prohibited the death penalty for one "who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." (*Id.* at p. 797 [73 L.Ed.2d at p. 1151].) It reversed the judgment upholding the death penalty for Enmund. (*Id.* at p. 801 [73 L.Ed.2d at p. 1154].)

19

In *Tison*, the United States Supreme Court revisited the issue of death sentences for accomplices to felony murder, in a case presenting significantly more egregious facts. In *Tison,* Gary Tison's sons Ricky, Raymond, and Donald Tison entered a prison with a large ice chest of weapons and armed their father and his cellmate, both convicted murderers. Brandishing the weapons, the group locked guards and visitors in a closet. During the subsequent escape, their car, already on its spare tire, suffered another flat, so the group agreed to flag down a passing motorist and steal a replacement car. Raymond waved down a family of four (the Lyons); the others then emerged from hiding and captured the family at gunpoint. Raymond and Donald drove the family into the desert in the Tisons' car with the others following in the Lyons's car. The Tisons transferred the possessions between the two cars, keeping guns and money from the Lyons's car. The Lyons family begged for their lives and for water. As Gary's sons were getting water, Gary and his cellmate killed all four Lyons family members with repeated shotgun blasts. When the Tisons were later apprehended at a roadblock, Donald was killed and Gary escaped into the desert, where he died of exposure. Ricky and Raymond Tison and the cellmate were tried and sentenced to death. (*Tison, supra,* 481 U.S. at pp. 139-141 [95 L.Ed.2d at pp. 132-134].)

The *Tison* court distinguished *Enmund*: "Far from merely sitting in a car away from the actual scene of the murders acting as the getaway driver to a robbery, each petitioner was actively involved in every element of the kidnapping-robbery and was physically present during the entire sequence of criminal activity, culminating in the murder of the Lyons family and the subsequent flight." (*Tison, supra*, 481 U.S. at p. 158 [95 L.Ed.2d at p. 144].) The court set forth the rule, codified in section 190.2, subdivision (d): "[M]ajor participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." (*Ibid.)*

The *Banks* court also considered *Kennedy v. Louisiana* (2008) 554 U.S. 407 at page 421 [171 L.Ed.2d 525], "where the court in dicta characterized the governing standard as permitting the death penalty for nonkillers whose 'involvement in the events leading up to the murders was active, recklessly indifferent, and substantial.' " (*Banks, supra,* 61 Cal.4th at p. 800.) The *Banks* court then examined *Enmund* and *Tison* more closely and found: "A sentencing body must examine the defendant's *personal* role in the crimes leading to the victim's death and weigh the defendant's individual responsibility for the loss of life, not just his or her vicarious responsibility for the underlying crime. [Citations.]" (*Banks,* at p. 801.) As to the mental aspect of culpability, "[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." (*Ibid.*)

The *Banks* court set forth several factors that distinguish *Enmund* and *Tison*, indicating they may be useful in determining whether a defendant qualifies as a major participant acting with a reckless disregard for human life. "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used? No one of these considerations is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major' [citations]." (*Banks, supra,* 61 Cal.4th at p. 803, fn. omitted.)

Although *Tison* and *Edmund* involved the death penalty, *Banks* explained: "[T]he standards we articulate, although developed in death penalty cases, apply equally to cases like this one involving statutory eligibility under section 190.2(d) for life imprisonment without parole." (*Banks, supra,* 61 Cal.4th at p. 804.) *Banks* made a few points clear. First, where the plan does not include the use of lethal force, "absence from the scene may significantly diminish culpability for death." (*Id*. at p. 803, fn. 5.) Second, knowledge of the possible risk of death inherent in certain felonies--like armed robbery and knowledge that confederates are armed--are insufficient alone to show a reckless indifference to human life. (*Id.* at p. 809.) The court disapproved two appellate court decisions to the extent they held awareness that a robbery accomplice is armed is sufficient alone to show reckless disregard for human life or a subjective awareness of a grave risk of death. (*Id.* at p. 809, fn. 8.)

With the new guidance provided by *Banks*, we consider whether substantial evidence supports the special circumstance as to Medina and Whitehead.

We review a challenge to the sufficiency of the evidence to support a special circumstance finding under the same standard we use to review the sufficiency of the evidence to support a conviction. (*People v. Cole* (2004) 33 Cal.4th 1158, 1229.)

B. *Analysis*

1. Medina

Following *Banks,* we conclude there was substantial evidence that Medina both was a major participant and acted with reckless indifference to human life. There was evidence he was involved in setting up the attempted robbery. He alerted Morton to the shortage of the drugs and agreed to accompany Morton to confront the suppliers. While Medina claims the plan was simply to get Morton's money back, it was clear Morton intended to use force, if necessary, and was preparing for an armed confrontation. There was evidence that Medina was armed and suspected the others would be. Medina was also involved in the actual attempted robbery, which did not begin until he and

22

Whitehead arrived. There was evidence Medina, as well as Morton and Whitehead, pulled out a gun and used it--first pointing it at the group and then walking Fletcher and Rainville across the street at gunpoint.[4]

Medina remained at the scene throughout. He waited at Morton's direction and made no attempt to intervene or avert the violence that followed. There was evidence, beyond his mere participation in an attempted armed robbery, that Medina was subjectively aware his participation involved a grave risk of death. (*Banks, supra,* 61 Cal.4th at pp. 807-808.) The events of May 2 indicated that Morton, as well as Medina, was willing to employ potentially deadly violence. There was evidence that on May 2 Morton handed Medina the gun he fired and that Morton had a gun and threatened "to get them." Medina had known Morton a long time and presumably knew Morton was a drug dealer and a felon. In describing the shooting, Medina told the police, "when the gun comes out, I was like oh, fuck, dude, so I went back to my car," although at trial he denied he knew what was going to happen. The record is unclear exactly how close Medina was to the shooting, but he testified the shots were "real close," so close he thought he might get shot. After the shooting, Medina drove Morton away and made no attempt to aid the victim.

Unlike Matthews in *Banks*, Medina was not simply a getaway driver. (*Banks, supra,* 61 Cal.4th at p. 805.) Rather, he was "actively involved in every element of the [attempted robbery] and was physically present during the entire sequence of criminal activity culminating in the murder of [Fletcher] and the subsequent flight." (*Tison, supra,* 481 U.S. at p. 158 [95 L.Ed.2d at p. 144].) There was evidence he played a role both in planning and executing the criminal enterprise, had and used a gun, and his prior

---

[4] As we explained in Part II B, *ante*, the jury could consider evidence that Medina was armed and used his gun even though the jury acquitted Medina of the personal use of a firearm enhancement.

experience with Morton gave him an awareness of the danger and risk of death. He helped Morton escape and had no concern for the shooting victim. (See *Banks, supra,* 61 Cal.4th at p. 803.) Substantial evidence supports the special circumstance finding.

### 2. Whitehead

Although in some respects the evidence against Whitehead is not as strong as that against Medina, it was sufficient to support the special circumstance finding. Although there was no evidence that Whitehead was involved in *planning* the attempted robbery, when he found out about it he *asked* to go, and participated fully as armed backup. It was undisputed that Whitehead had and used a gun. When he and Medina arrived at the scene, he was the first out of the car and immediately pulled out his gun. Morton asked him to watch Rainville because Morton suspected Rainville was armed. Whitehead left before the actual shooting, but only because Morton ordered him to take Sarmento away. At the time Whitehead left the scene, Morton was visibly angry at Fletcher and holding him at gunpoint.

The evidence of Medina's reckless indifference to human life applies as well to Whitehead. Like Medina, Whitehead was present on May 2 and knew Morton well. He knew Morton and Medina were not reluctant to shoot and was eager to be a part of their armed confrontation with Fletcher. Although Whitehead was not present at the shooting, unlike Matthews in *Banks*, he heard it. He then returned to aid Morton and Medina and he left again as soon as he saw they were safe. He made no effort to determine if anyone was injured or to offer aid. (See *People v. Smith* (2005) 135 Cal.App.4th 914, 927-928 and cases cited [failure to aid victim or summon help shows reckless indifference to human life].)

Whitehead argues his young age, 18 and 39 days, confirms that he was not subjectively aware his conduct carried a grave risk of death. He relies on the observations in *Miller v. Alabama* (2012) 567 U.S. ___ [183 L.Ed.2d 407] of the "hallmark features" of youth that reduce the culpability of minors. As we discuss more

24

fully in Part X, *post*, Whitehead was not a minor so *Miller* does not apply to him. Further, Whitehead points to no evidence showing that his youth, or other personal characteristics, diminished his ability to appreciate the danger created by his conduct in eagerly joining Morton and Medina as armed backup in their ill-fated attempt to remedy an illegal drug deal gone bad.

## IV

### *Exclusion of Rocha's Testimony and Gang Evidence*

Medina contends the trial court erred in excluding testimony from Rocha that he believed the men in the Lexus were gang members and he feared them, and in excluding evidence that Ramos was a gang member and of gang indicia found in the Lexus. Medina contends this error was prejudicial because it was devastating to his self-defense claim.

### A. *Background*

Before trial, the People moved to exclude any evidence of the gang affiliations of Ramos or Granados. Ramos had admitted he had previously been validated as a Norteño gang member in 2004. The police found red clothing in the car that they believed was connected to a gang. Cell phone photographs also indicated a gang connection.

Medina objected to the exclusion, arguing this evidence was "a very critical aspect of the defense." That defense was self-defense. Rocha would testify he feared becoming a victim of a gang-related shooting, and his testimony would corroborate the perspective of Medina and others in his car.

The court granted the motion to exclude evidence of any gang affiliation. The court ruled Rocha could testify about his observations of the Lexus, but not about his conclusions, particularly any mention of his fear of gang involvement. The court found Rocha's state of mind was irrelevant. Medina raised the issue multiple times; each time, the court ruled the same way.

B.  *Analysis*

The trial court properly excluded the evidence of any gang affiliation of Ramos and Granados.  Gang evidence is inadmissible to show a criminal disposition.**5**  (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449; *People v. Perez* (1981) 114 Cal.App.3d 470, 477.)  Although Medina contends the evidence would show that his fear of the Lexus and its occupants was reasonable, there was no evidence that *he knew* the occupants of the Lexus or that they were gang members.  The reasonableness of Medina's belief must be measured by what *he* saw and what *he* knew.  "The law [of self-defense] recognizes that the objective component is not measured by an abstract standard of reasonableness but one based on the defendant's perception of imminent harm or death.  Because his state of mind is a critical issue, he may explain his actions in light of his knowledge concerning the victim.  [Citations.]"  (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1094.)  Evidence of the victim's reputation for dangerousness or his prior acts of violence are relevant to a claim of self-defense *only* if the defendant knew of the victim's reputation or violent acts.  (*People v. Tafoya* (2007) 42 Cal.4th 147, 165; *People v. Cash* (2002) 28 Cal.4th 703, 726.)

Rocha's testimony that he believed and feared that the occupants of the Lexus were gang members was inadmissible for the same reason.  Rocha's fear was irrelevant because there was no evidence that Rocha communicated his belief to Medina.  Rocha was permitted to testify about what he observed of the Lexus, both its erratic driving and the motions of its occupants.  From this testimony and Medina's testimony the jury was able to assess the reasonableness of Medina's need for self-defense.

---

**5** Medina's proffer did not include any argument that the gang evidence was relevant to motive or any other permissible use.  (See, e.g., *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 [evidence of gang affiliation may be relevant and admissible to help prove identity, motive, modus operandi, specific intent, or other issues].)

26

V

*Exclusion of Evidence Fletcher Sought a Knife*

The People moved in limine to exclude evidence that Fletcher asked Cauble to find a knife before the meeting with Morton, arguing it was hearsay, irrelevant, and inflammatory. The trial court excluded the evidence, finding it was hearsay and irrelevant because defendants did not know Fletcher had sought a weapon. Later in the trial, Morton argued he should be able to ask Cauble if she had looked for a knife to impeach her claim of peacefulness and to show Fletcher's mindset. The trial court again ruled the evidence was irrelevant, and any relevance was "far outweighed" by prejudice.

Defendants contend the trial court erred in excluding this evidence. First, they assert the evidence was not hearsay because it was a request and did not assert any fact. They are correct. In *People v. Jurado* (2006) 38 Cal.4th 72, our Supreme Court held a request for a "gat" (a gun) was not hearsay. "Because a request, by itself, does not assert the truth of any fact, it cannot be offered to prove the truth of the matter stated." (*Id.* at p. 117.) The statement was offered to prove the words were *said*, not that those words were *true*. The trial court erred in finding the evidence hearsay.[6]

Next, defendants contend the evidence was relevant to show Fletcher's aggressive state of mind. They argue a claim of self-defense places the victim's state of mind at issue. (*People v. Romero* (2007) 149 Cal.App.4th 29, 37 [evidence of victim's fear of defendant admissible to show victim was not aggressor].) However, this evidence is not as probative as they assert--a fact which weakens their argument. It is undisputed that Fletcher did not have a knife or any weapon. Either he was comfortable meeting with

---

[6] The People offer the following analysis in their briefing: "First of all, it is undisputed that Fletcher is dead, so his statements constitute hearsay and are inadmissible at trial." This analysis is severely flawed, and suggests a lack of basic understanding of what does and what does not constitute hearsay.

Morton without a weapon, which would indicate he was not that aggressive, or he compensated for his lack of a weapon by bringing Rainville, who had a knife, with him. The jury heard evidence of Rainville's knife and that he came as "muscle." Given the limited probative value of this evidence, any error in excluding it was harmless. (*People v. Eubanks* (2011) 53 Cal.4th 110, 151.)

Defendants further argue the evidence was relevant to impeach Cauble's testimony that she was a "peacemaker," who intended just to make "everything right." Cauble's state of mind--as a peacemaker or a combatant--was irrelevant; she did not have a weapon and there was no evidence she engaged in any violent act. A trial court has discretion to exclude impeachment evidence on a collateral matter. (*People v. Price* (1991) 1 Cal.4th 324, 412.)

VI

*Exclusion of Medical Examiner's Testimony*

On cross-examination Morton asked the medical examiner about abrasions and bruises on Fletcher's body. She testified he had abrasions that he could have received when he fell or "potentially" when he hit someone or was hit. There were also bruises that could have occurred at or near the time of death. Fletcher also had "a bunch of bruises" that were healing; most of these were on his legs. He had two parallel bruises, each five centimeters long, spaced 3.5 centimeters apart. She was not sure what caused these. She testified they were probably not caused by a shoe "unless it's two separate kicks with an edge . . . and they just happened to hit parallel."

As relevant here, Morton then asked three questions: 1) "And really at this point in time, you can't rule out that Mr. Fletcher did not get into a fight prior to his death or at the time of his death?"; 2) "Well, with respect to your medical opinion and Mr. Fletcher perhaps getting into a fight, can you, to a medical certainty, say that he did not get in a fight at the time?"; and 3) "Could you say that his injuries are consistent with Mr. Jason

28

Fletcher fighting at the time of his death?"  The trial court sustained the People's objections on the basis of speculation as to each question.

Defendants contend the trial court erred in excluding the medical examiner's opinion that Fletcher's injuries were consistent with a fight.  We first observe that medical examiners are generally permitted to opine on the significance, including the potential source, of injuries to a victim.  (See *Mayfield*, *supra,* 14 Cal.4th at p. 766 ["A forensic pathologist who has performed an autopsy is generally permitted to offer an expert opinion not only as to the cause and time of death but also as to circumstances under which the fatal injury could or could not have been inflicted"].)  Because they are expert witnesses, they are permitted to "speculate" as to causation, so long as such speculating is properly within the context of giving an informed expert opinion in response to a question.  Here, however, the error in disallowing the questions was harmless, because the medical examiner had *already* given her opinion as to whether Fletcher's injuries could have been caused by a fight.  She testified the abrasions were "potentially" caused by hitting or being hit, and it was possible, though unlikely, the parallel bruises were caused by kicks.  A trial court has broad discretion under Evidence Code section 352 to exclude cumulative evidence.  (*People v. Pride* (1992) 3 Cal.4th 195, 235; see *People v. Partida* (2005) 37 Cal.4th 428, 436, fn. 2.)  We see no prejudicial error.

VII

*Instruction on Claim-of-Right*

Defendants contend the trial court erred in instructing on claim-of-right.  They argue this instruction is inapplicable to the factual scenario of Morton attempting to take back his methamphetamine at gunpoint for several reasons.  First, they contend the claim-of-right defense has no application where defendant takes property that is indisputably his.  They assert that this case involves a missing element of robbery or attempted robbery--taking the property of another--not a defense that negates the required intent.

29

Second, the exception to the claim-of-right defense for illegal activity applies only to a dispute among crime partners to the proceeds of illegal activity. Third, the illegal activity exception "is in derogation of the statute defining robbery and hence violated the separation of powers."

A. *Background*

At trial Morton testified that when he pulled the gun on Fletcher and others in the car, he intended only to get his methamphetamine back. He then asked Cauble to get the drugs back.

The People requested the court instruct the jury using CALCRIM No. 1863 and there was no objection. The trial court instructed the jury as follows: "If a defendant obtained or attempted to obtain property under a claim of right, he did not have the intent required for the crime of attempted robbery. [¶] The defendant obtained or attempted to obtain property under a claim of right if he believed in good faith that he had a right to the specific property or a specific amount of money, and he openly took it or attempted to take it. [¶] In deciding whether the defendant believed he had a right to the property and whether he held that belief in good faith, consider all the facts known to him at the time he obtained or attempted to obtain the property, along with all the other evidence in the case. The defendant may hold a belief in good faith even if the belief is mistaken or unreasonable. But if the defendant was aware of facts that made the belief completely unreasonable, you may conclude that the belief was not held in good faith. The claim of right defense does not apply if the claim arose from an activity commonly known to be illegal or known by the defendant to be illegal. [¶] If you have a reasonable doubt as to whether the defendant had the intent required for attempted robbery, you must find him not guilty of attempted robbery."

In closing argument, both sides argued the claim-of-right defense did not apply. The People argued the attempted taking of either the car or the drugs supported attempted robbery (the court gave a unanimity instruction), and Morton admitted attempted robbery

30

by claiming he pulled the gun to get his drugs back. The People stressed, "the claim-of-right defense does not apply if the claim arose from an activity commonly known to be illegal, or known by the defendant to be illegal." Morton argued there was no attempted robbery because he never attempted to take property of another. He argued claim-of-right and its illegal activities exception applied only to the *belief* the property was defendant's, but not when the property (here the drugs) was indisputably defendant's.

B. *The Law*

Robbery is "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.)

Although the language of the statute requires that the taking be from the *possession* of another and makes no reference to *ownership*,[7] "the Legislature over 100 years ago codified in the current robbery statute the common law recognition that a claim-of-right defense can negate the *animus furandi* element of robbery where the defendant is seeking to regain specific property in which he in good faith believes he has a bona fide claim of ownership or title." (*Tufunga, supra*, 21 Cal.4th at p. 950.) The *animus furandi* of robbery is the felonious intent to steal. (*Id*. at p. 945.)

Our Supreme Court has explained the claim-of-right defense: " 'Although an intent to steal may ordinarily be inferred when one person takes the property of another, particularly if he takes it by force, proof of the existence of a state of mind incompatible with an intent to steal precludes a finding of either theft or robbery. It has long been the rule in this state and generally throughout the country that a bona fide belief, even though

---

[7] Justice Mosk made this observation in his dissent in *People v. Butler* (1967) 65 Cal.2d 569 at page 576. *Butler* was overruled to the extent it extended the claim of right defense to robberies perpetuated to settle or collect on a debt by *People v. Tufunga* (1999) 21 Cal.4th 935, 956 (*Tufunga*).

mistakenly held, that one has a right or claim to the property negates felonious intent. [Citations.] A belief that the property taken belongs to the taker [citations], or that he had a right to retake goods sold [citation] is sufficient to preclude felonious intent. Felonious intent exists only if the actor intends to take the property of another without believing in good faith that he has a right or claim to it. [Citation.]' [Citation.]" (*People v. Barnett* (1998) 17 Cal.4th 1044, 1143.)

In *Tufunga, supra,* 21 Cal.4th at page 950, the court declined to abolish the claim-of-right defense to robbery on policy grounds. The *Tufunga* court explained, by tracing the history of the robbery statute, that the requirement that the property taken belong to another is necessary to establish the "felonious intent" or *animus furandi* element of robbery; taking one's own property--"property to which he has lawful title or a bona fide claim of ownership"--does not involve a felonious intent. (*Id.* at p. 948; see also *id.* at pp. 946-948.) Further, theft is a lesser included offense of robbery and it has long been recognized as a "commonsense notion" that one "cannot steal his own property" and section 484 defines theft as the taking of "the personal property of another." (*Id.* at p. 948.)

The claim-of-right defense does not apply to claims based on "notoriously illegal activities." (*People v. Hendricks* (1988) 44 Cal.3d 635, 642.) "As a matter of law, one cannot have a good faith belief that he has a right to property when that 'right' is rooted in a notoriously illegal transaction. [Citation.]" (*People v. Gates* (1987) 43 Cal.3d 1168, 1182 (*Gates*), disapproved on other grounds in *People v. Williams* (2010) 49 Cal.4th 405, 458-459.) When the purported "right" to the property is based on an illegal endeavor, the felonious intent is not negated. (*People v. Johnson* (1991) 233 Cal.App.3d 425, 457 (*Johnson*).)

C. *Analysis*

Defendants' contention that the claim-of-right defense does not apply because the drugs were indisputably Morton's fails. The defense applies to property to which defendant has "lawful title or a bona fide claim of ownership." (*Tufunga, supra,* 21 Cal.4th at p. 948.) It applies equally where defendant's claim to the property is in good faith, regardless of whether it is valid, mistaken, disputed or undisputed. (*People v. Barnett, supra,* 17 Cal.4th at p. 1143.) As *Tufunga* teaches, the requirement that the property belong to another is necessary to establish the felonious intent; it is not an element separate from intent. (*Tufunga, supra,* 21 Cal.4th at pp. 946-948.) Defendants' argument that their defense was a "missing element" defense, not a claim-of-right defense fails because the two are the same; the "missing element" is the felonious intent.

It not the specific *nature* of Morton's claim, but rather the illegal activity *giving rise* to the claim, that makes the claim-of-right defense inapplicable here. Morton's claim to the drugs arose from an illegal activity, drug dealing. In such cases, the instruction need not, and usually should not, be given. (*Johnson, supra,* 233 Cal.App.3d at pp. 457-458 [proper to refuse claim-of-right instruction where defendant sought payment for drug deal].) Here, the People, not the defense, requested the instruction. This request, presumably, was to counter defendants' "missing element" defense--that one cannot commit robbery by taking one's own property by force--by instructing about the illegal activity exception.[8] Since the instruction correctly told the jury the claim-of-right defense did not apply, there was no prejudice in giving the instruction.

Defendants contend the illegal activity exception is a narrow one and applies only to a dispute among crime partners over the profits or proceeds of a criminal activity. They point out the exception applied in *Gates, supra,* 43 Cal.3d 1168, to a dispute over

---

[8] The better solution to this issue would be for the trial court to prohibit the defense from making the "missing element" argument, as contrary to the law.

proceeds from a forgery ring, and in *People v. Hendricks, supra,* 44 Cal.3d 635, to the proceeds from prostitution. We find no support for such a narrow interpretation. *Gates* held, "one cannot have a good faith belief that he has a right to property when that 'right' is rooted in a notoriously illegal transaction. [Citation.]" (*Gates, supra,* 43 Cal.3d at p. 1182.) Nothing in that language limits the illegal activity exception to a dispute over proceeds of illegal activity. In *Johnson,* the court found the argument questioning whether methamphetamine may be deemed the product of a notoriously illegal activity "approaches the frivolous." (*Johnson, supra,* 233 Cal.App.3d at p. 457.)

Finally, defendants contend the judicially created illegal activities exception violates separation of powers because the courts have defined a crime. (See *People v. Chun* (2009) 45 Cal.4th 1172, 1183 [" ' "the power to define crimes and fix penalties is vested exclusively in the legislative branch" ' "].) Our Supreme Court has repeatedly recognized the illegal activities exception to the claim-of-right defense in *Gates*, *Hendricks*, and *Tufunga.* We must accept the law as explained by our Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

VIII

*Denial of Continuance*

Whitehead contends the trial court erred in denying a continuance for his newly retained counsel to investigate and prepare a motion for a new trial. He argues judicial efficiency must give way to defendant's choice of counsel.

A. *Background*

The jury returned its verdicts on October 27, 2011, and sentencing was scheduled for December 9, 2011.

On December 6, 2011, Kenny Giffard, newly retained counsel for Whitehead, filed a motion to continue judgment and sentencing. Giffard sought to establish good cause for the continuance by a declaration in which he stated he had been retained by Whitehead in early November "to file an appeal and seek any other post-trial remedies in

34

this case."  Giffard further declared he had reviewed discovery from the prosecutor and had spoken with Whitehead on several occasions.  He had determined that a motion for a new trial was appropriate.  "Without articulating any specific basis, this motion would be brought on statutory grounds pursuant to Penal Code section 1181 and on a non-statutory basis pursuant to *People v. Pope* (1979) 23 Cal.3d 412 and *People v. Fosselman* (1983) 33 Cal.3d 572."

At the date set for sentencing, Whitehead's trial counsel, Michael Hansen, told the court that Whitehead had retained new counsel and therefore Hansen had not reviewed the probation report with him.  The court responded that being retained to review the case "for whatever purposes" was not good cause for a continuance "and I do not intend to delay Mr. Whitehead's Judgment and Sentence for the purpose of further review, whatever that may entail, or for appeal purposes."  Giffard stated he had been retained to look at all issues, including filing a motion for a new trial.  The court responded that was not good cause.  "[Y]ou don't have a right to step in at this point and claim that the [sentencing] can be delayed so that you can take time, months, in fact, to review the entire trial transcript to see if perhaps there [are] grounds for a Motion for a New Trial . . . .  I haven't seen that in your moving papers.  I know you weren't here at trial. So I know you don't have one."

Giffard replied that he did not need to review the entire trial transcript, only certain motions, minute orders, and one short transcript.  He had spoken with the prosecutor about a briefing schedule.  The court said because Giffard could not state the grounds for a new trial, it would not delay sentencing.  Giffard then offered the issues of severance, instructional error, and ineffective assistance of counsel.  The court dismissed these bases as "pure speculation" and gave either Hansen or Giffard an opportunity to go over the probation report with Whitehead.  "I don't care which one of you do [*sic*] it, but he is going to be sentenced today."

Giffard protested that the need to explore grounds for a new trial motion was good cause for a short continuance. In response to the court's view that counsel was just guessing, Giffard claimed it was "a professional guess." The court repeated that Whitehead was "going to be sentenced today."

After Medina and Morton were sentenced, Giffard reported he had reviewed the probation report with Whitehead the night before "out of an abundance of caution." He argued that after speaking with his client, Hansen's effectiveness at trial had become an issue, and a claim of ineffective assistance of counsel is more appropriately brought in a new trial motion or on a writ of habeas corpus than on appeal. The court disagreed, noting it saw ineffective assistance of counsel claims in every appeal it read: "[T]hat's number one on the hit parade."[9] The court indicated it was prepared to proceed but asked the prosecutor what he thought. The prosecutor indicated he was prepared to proceed. "[A]s far as my memory serves me, this trial was actually very clean. There weren't any issues of substance that I recall with Mr. Whitehead." The court noted it found Hansen's performance competent. The court then sentenced Whitehead to an indeterminate term of LWOP consecutive to a determinate term of ten years.

B. *The Law*

The general policy of California law is against continuances in criminal cases. "It is therefore recognized that the people, the defendant, and the victims and other witnesses have the right to an expeditious disposition, and to that end it shall be the duty of all courts and judicial officers and of all counsel, both for the prosecution and the defense, to expedite these proceedings to the greatest degree that is consistent with the ends of

---

[9] Actually, Giffard was correct that a claim of ineffective assistance of counsel is often more appropriately brought in a new trial motion or on a writ of habeas corpus than on direct appeal. (See *People v. Pope, supra,* 23 Cal.3d at pp. 426-427; *People v. Fosselman, supra,* 33 Cal.3d at pp. 582-583.)

justice." (§ 1050, subd. (a).) "Continuances shall be granted only upon a showing of good cause." (§ 1050, subd. (e).) A party requesting a continuance is to provide affidavits or declarations "detailing specific facts showing that a continuance is necessary." (§ 1050, subd. (b).) The party moving for a continuance in a criminal trial must "present[] affirmative proof in open court that the ends of justice require a continuance." (Cal. Rules of Court, rule 4.113.)

"Whether good cause exists is a question for the trial court's discretion. [Citation.] The court must consider ' " 'not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion.' " ' [Citation.]" (*People v. Doolin* (2009) 45 Cal.4th 390, 450.) "A showing of good cause requires a demonstration that counsel and the defendant have prepared for trial with due diligence. [Citations.]" (*People v. Jenkins* (2000) 22 Cal.4th 900, 1037.) "The party challenging a ruling on a continuance bears the burden of establishing an abuse of discretion, and an order denying a continuance is seldom successfully attacked. [Citation.]" (*People v. Beames* (2007) 40 Cal.4th 907, 920.)

" '[B]road discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary "insistence upon expeditiousness in the face of a justifiable request for delay" violates the right to the assistance of counsel.' [Citations.]" (*People v. Alexander* (2010) 49 Cal.4th 846, 934.)

"[T]he trial court may not exercise its discretion 'so as to deprive the defendant or his attorney of a reasonable opportunity to prepare.' [Citation.]" (*People v. Doolin, supra,* 45 Cal.4th at p. 450.) "Hearing and disposition of a motion for new trial is an integral part of the criminal trial. The failure to allow counsel adequate time to prepare for this part in effect deprives a defendant of his right to counsel. [Citation.]" (*People v.*

*Ketchel* (1963) 59 Cal.2d 503, 545-546, disapproved on other grounds in *People v. Morse* (1964) 60 Cal.2d 631, 649.)

C. *Analysis*

At the outset, we note that we find troubling the trial court's inexplicable insistence that Whitehead be sentenced that day. Such statements suggest " 'an unreasoning and arbitrary "insistence upon expeditiousness." ' " (*People v. Alexander, supra,* 49 Cal.4th at p. 934.) That insistence is particularly inappropriate in a case involving an LWOP sentence for a defendant who was barely 18 at the time of his crimes and was not the triggerman. Whether he is ultimately deserving of such a harsh sentence is irrelevant to the trial court's need to refrain from acting in an arbitrary fashion. The trial court did not question counsel about the length of the continuance requested, instead protesting a delay of "months," while Giffard had asked only for a "short continuance." "To exercise the power of judicial discretion, all material facts and evidence must be both known and considered, together with legal principles essential to an informed, intelligent and just decision. [Citation.]" (*People v. Lara* (2001) 86 Cal.App.4th 139, 165.) That said, the key issue before us is whether Whitehead established good cause for a continuance such that denial of the continuance was an abuse of discretion.

Giffard's declaration stated he had been retained in early November. Thus, at the time of sentencing, he had been on the case for a month. He therefore presumably had *some* time before the sentencing date to explore possible bases for a new trial. His declaration failed to set forth "specific facts showing that a continuance is necessary." (§ 1050, subd. (b).) He also failed to show that he had not had "a reasonable opportunity to prepare." (*People v. Sakarias* (2000) 22 Cal.4th 596, 646 [no abuse of discretion to deny continuance at sentencing to prepare new trial motion].) At the hearing, Giffard indicated he needed to review only selected portions of the trial record to prepare a motion for a new trial--motions, minute orders, and a short transcript--but failed to explain why he had been unable to do so during the previous month. Given the failure to

38

present good cause for a continuance, the trial court did not abuse its discretion in denying it. (See *People v. Mendes* (1950) 35 Cal.2d 537, 542 [in murder trial no abuse of discretion to deny continuance where new counsel retained 10 days before trial and had assistance of previous counsel].)

Relying on *People v. Courts* (1985) 37 Cal.3d 784, Whitehead contends the denial of the continuance deprived him of his right to counsel of choice. In *Courts*, defendant sought a continuance to be represented at trial by retained counsel. Our Supreme Court ruled that the trial court should have granted the continuance because defendant had previously been in contact with the new attorney he wanted to hire, in that he had made final arrangements and had already paid a retainer. (See *id*. at pp. 791-792.) *Courts* is distinguishable. Here, the issue is not whether Whitehead could be represented by his counsel of choice; he *was* represented posttrial by Giffard, and he had been so represented for a month by the sentencing date. Rather, the issue is whether Giffard made an adequate showing of good cause for a continuance to prepare a motion for a new trial. Because Giffard failed to make the required showing of good cause, denial of the request for a continuance was not an abuse of discretion.

## IX

### *Cumulative Error*

Defendants contend that a combination of errors rendered their trial fundamentally unfair, requiring reversal. "[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844.) "[A] defendant [is] entitled to a fair trial but not a perfect one." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) We conclude that any errors or assumed errors were harmless, whether reviewed separately or cumulatively.

## X

### *Cruel and Unusual Punishment*

Whitehead contends the statutory scheme that mandated a sentence of LWOP without an individualized consideration of whether a sentence that provided the opportunity for parole was more appropriate imposed cruel and unusual punishment. He sets forth at length the factors that make a sentence with the possibility of parole more appropriate for him and requests this court reduce his sentence under *People v. Dillon* (1983) 34 Cal.3d 441. In the alternative, he requests this court remand the matter to the trial court to perform the individualized consideration.

A. *Forfeiture*

The People contend Whitehead has forfeited this contention by failing to raise it at sentencing. To the extent Whitehead is making an as-applied constitutional challenge-- and much of his briefing is devoted to showing why a LWOP sentence is inappropriate *for him*--we agree the claim is forfeited. "Forfeiture is particularly appropriate where resolution of factual issues is necessary to determine whether the sentence is grossly disproportionate to the offender's culpability." (*People v. Gonzalez* (2014) 225 Cal.App.4th 1296, 1313.) "Since the determination of the applicability of *Dillon* in a particular case is fact specific, the issue must be raised in the trial court." (*People v. DeJesus* (1995) 38 Cal.App.4th 1, 27.)

Whitehead also contends, however, that the *statutory scheme* of section 190.2 is unconstitutional because it mandates a LWOP sentence where the penalty sought is not death without an individualized consideration of the defendant being sentenced. An appellate court has discretion to consider constitutional issues raised for the first time on appeal, "especially when the enforcement of a penal statute is involved [citation], the asserted error fundamentally affects the validity of the judgment [citation], or important issues of public policy are at issue [citation]." (*Hale v. Morgan* (1978) 22 Cal.3d 388, 394.) Since Whitehead's claim meets these criteria, it is appropriate that we consider it.

B.  *Right to Individualized Sentencing*

Whitehead's contention essentially is that he has "the fundamental right to individual consideration in sentencing."

The United States Supreme Court has required individual consideration of the defendant before imposing the death penalty.  (*Lockett v. Ohio* (1978) 438 U.S. 586, 605 [57 L.Ed.2d 973, 990]; *Woodsen v. North Carolina* (1976) 428 U.S. 280, 304 [49 L.Ed.2d 944, 961].)  The high court, however, has stated "that, in noncapital cases, the established practice of individualized sentences rests *not on constitutional commands*, but on public policy enacted into statutes."  (*Lockett,* at pp. 604-605 [57 L.Ed.2d at p. 990], italics added.)  In *Harmelin v. Michigan* (1991) 501 U.S. 957 at pages 995 and 996 [115 L.Ed.2d 836, 865], the court refused to extend the requirement of individualized sentencing to a mandatory LWOP sentence.  "Our cases creating and clarifying the 'individualized capital sentencing doctrine' have repeatedly suggested that there is no comparable requirement outside the capital context, because of the qualitative difference between death and all other penalties.  [Citations.]  [¶]  'The penalty of death differs from all other forms of criminal punishment, not in degree but in kind.  It is unique in its total irrevocability.  It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice.  And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity.'  [Citation.]"  (*Ibid.*)

Whitehead argues that a LWOP sentence has been regarded "as equally severe" to a punishment of death.  (See *People v. Bloom* (1989) 48 Cal.3d 1194, 1223, fn. 7.)  The *Hamelin* court, however, rejected the argument that the severity of a LWOP sentence renders it unique in the same way as a death sentence.  A sentence of LWOP "cannot be compared with death.  We have drawn the line of required individualized sentencing at capital cases, and see no basis for extending it further."  (*Harmelin v. Michigan, supra,* 501 U.S. at p. 996 [115 L.Ed.2d at p. 865].)

41

Whitehead also relies on *Miller v. Alabama, supra,* 567 U.S. __ [183 L.Ed.2d 407]. In *Miller,* the court held "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments' " because it "runs afoul of our cases' requirement of individualized sentencing for defendants facing the most serious penalties." (*Id.* at p. __ [183 L.Ed.2d at pp. 414-415].)

"At the core of *Miller's* rationale is the proposition—articulated in *Roper* [*v. Simmons* (2005) 543 U.S. 551], amplified in *Graham* [*v. Florida* (2010) 560 U.S. 48], and further elaborated in *Miller* itself—that constitutionally significant differences between children and adults 'diminish the penological justifications for imposing the harshest sentences on juvenile offenders.' [Citation.] The high court said in plain terms that because of 'children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon.' [Citation.] 'That is especially so because of the great difficulty . . . of distinguishing at this early age between "the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." [Citations.]' [Citation.]" (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1379.)

Whitehead was 18 when he committed his offenses. He was not a juvenile, and, since he was eligible for the death penalty, LWOP was not the most serious penalty he could have faced. Accordingly, the concerns expressed in *Miller* do not apply to him.

Whitehead argues he was only 39 days past his 18th birthday and his "youth did not suddenly cease to matter on his 18th birthday." While Whitehead's point is well taken, courts have upheld recognition of age 18 as "the point where society draws the line for many purposes between childhood and adulthood." (*Roper v. Simmons, supra,* 543 U.S. at p. 574 [161 L.Ed.2d at p. 25] [Eighth Amendment prohibits death penalty for juveniles under 18].) "Drawing the line at 18 years of age is subject, of course, to the

42

objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach. For the reasons we have discussed, however, a line must be drawn." (*Ibid*. [161 L.Ed.2d at pp. 24-25].) "Making an exception for a defendant who committed a crime just 5 months past his 18th birthday opens the door for the next defendant who is only 6 months into adulthood. Such arguments would have no logical end, and so a line must be drawn at some point. We respect the line our society has drawn and which the United States Supreme Court has relied on for sentencing purposes . . . ." (*People v. Argeta* (2012) 210 Cal.App.4th 1478, 1482.)

Whitehead argues for reduction of his sentence under *Dillon*. *Dillon* does not aid him because it determined the life sentence before it was cruel or unusual *as applied* to that particular defendant. (*People v. Dillon, supra,* 34 Cal.3d at p. 477 ["As the record before us illustrates, however, in some first degree felony-murder cases this Procrustean penalty may violate the prohibition of the California Constitution against cruel or unusual punishments"].) It did not require individualized sentencing in all cases. Nor does *In re Rodriguez* (1975) 14 Cal.3d 639, assist Whitehead in his argument for individualized sentencing, because it also addresses an as-applied challenge. There, the petitioner had served 22 years of an indeterminate life sentence for lewd conduct with a child. Our Supreme Court declined to find the maximum life sentence, under the Indeterminate Sentence Law then in place, unconstitutional on its face. (*Id.* at p. 648.) It did find the 22 years petitioner had served "excessive and disproportionate punishment" and ordered petitioner discharged from custody. (*Id*. at p. 653; see also *id*. at p. 656.)

Whitehead has failed to show his LWOP sentence is cruel and unusual on its face, and has forfeited any other challenge thereto.

43

XI

*Presentence Custody Credit*

Medina, Morton, and Whitehead contend the trial court erred in denying them credit for their actual presentence custody. The People concede the error, but do not weigh in on the number of days of credit to which each defendant is entitled.

Citing section 2933.2, the probation reports for defendants declared no time credits accrue for those convicted of murder. The trial court stated each defendant had no conduct credit. The abstracts of judgment show no credit for time served, actual or conduct credit.

"Section 2933.2 provides that convicted murderers are not entitled to credits pursuant to sections 2933 and 4019, but those provisions concern work time credits and conduct credits. They do not address presentence custody credits. [Citation.] [¶] Section 2900.5 awards defendant credit for all days spent in custody. This provision applies to all defendants. [Citation.]" (*People v. Johnson* (2010) 183 Cal.App.4th 253, 289.) "A sentence that fails to award legally mandated custody credit is unauthorized and may be corrected whenever discovered. [Citation.]" (*People v. Taylor* (2004) 119 Cal.App.4th 628, 647.)

We award defendants presentence custody credit as follows. The probation report indicates Medina had served 1,286 days before sentencing, of which 56 days were served on a prior commitment. He is not entitled to credit for time served for an unrelated offense. (*In re Joyner* (1989) 48 Cal.3d 487, 489.) Accordingly, he is entitled to 1,230 days of presentence custody credit. Morton had served 1,314 days and is entitled that amount of credit. Whitehead served 1,286 days, with 3 days attributable to another offense. He is entitled to 1,283 days of presentence custody credit.

44

XII

*Unauthorized Sentences*

Our review of the record has revealed unauthorized sentences for all three defendants. At sentencing, the trial court stayed, pursuant to section 654, the sentences on count 2 (attempted robbery) for all three defendants, on count 4 (unlawful possession of a firearm) for Morton, and count 8 (shooting at an occupied vehicle) for Medina without imposing any sentence for these offenses. Staying *imposition* of sentence is an improper implementation of section 654 and results in unauthorized sentences. (*People v. Alford* (2010) 180 Cal.App.4th 1463, 1468-1469, 1472.) "A trial court must impose sentence on every count but stay execution as necessary to implement section 654." (*Id.* at p. 1472.)

In the interests of judicial economy, we exercise our authority to modify the judgment (§ 1260) rather than remanding for resentencing. (*People v. Alford, supra,* 180 Cal.App.4th at p. 1473.) We impose a concurrent midterm sentence on all these counts with consecutive firearm enhancements as follows. For Medina, a sentence of two years on count 2 (§§ 213, subd. (a)(1)(B), 664, subd. (a)) and five years on count 8 (§ 246) with two 25-year-to-life firearm enhancements (§ 12022.53, subd. (d)).[10] For Morton, a sentence of two years on count 2 with a 25-year-to-life enhancement, and a sentence of two years on count 4. (Former § 12021, subd. (a)(1); § 18.)[11] For Whitehead, a sentence of two years on count 2 with a 10-year firearm enhancement. (§ 12022.53, subd. (b).) We stay execution of all these sentences under section 654.

---

[10] These sentences for Medina will require completion of a determinate abstract of judgment (Judicial Council Form CR-290), which should show the trial court sentenced Medina to the midterm of two years, stayed, on count 10.

[11] Amending the abstract of judgment to reflect the sentence on count 4 will address Morton's contention that the abstract should be corrected to show the sentence was stayed.

## DISPOSITION

The judgments are modified to award all three defendants custody credit (§ 2900.5) and to impose and stay defendants' sentences (§ 654) on counts 2, 4, and 8 as set forth in this opinion. The trial court is directed to amend and correct the abstracts of judgment in accordance with this opinion and to forward certified copies thereof to the Department of Corrections and Rehabilitation. As modified, the judgments are affirmed.


      /s/
Duarte, J.


We concur:


   /s/
Raye, P. J.


   /s/
Blease, J.


46